UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BERTRAM HIRSCH and IGOR ROMANOV, on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br><br>vs.<br><br>CITIBANK, N.A.,<br><br>                    Defendant. | Case No. 12 Civ. 1124 (DAB)<br><br>ECF Case |

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND STAY THE ACTION

The Law Office of James C. Kelly
477 Madison Avenue, Sixth Floor
New York, New York 10022
Tel: 212-920-5042
Fax: 888-224-2078
Email: jkelly@jckellylaw.com

*Attorney for Plaintiffs*

April 17, 2012

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION……………………………………………………………1

II.    STATEMENT OF FACTS……………………………………………………1

III.   PROCEDURAL HISTORY…………………………………………………..7

IV.    ARGUMENT…………………………………………………………………9

    A.     NO AGREEMENT TO ARBITRATE WAS FORMED………………………..9

    B.     THE ARBITRATION AGREEMENT IS ILLUSORY AND
           THEREFORE NEVER EXISTED……………………………………………12

    C.     THE ARBITRATION AGREEMENT DOES NOT APPLY TO
           CHECKING ACCOUNTS……………………………………………………12

    D.     THE ARBITRATION AGREEMENT IS VOIDABLE BECAUSE
           CITIBANK MISREPRESENTED ITS TERMS……………………………...13

    E.     THE ARBITRATION AGREEMENT CANNOT BE PERFORMED
           BY ITS OWN TERMS………………………………………………………..14

    F.     THE ARBITRATION CLAUSE IS UNCONSCIONABLE AND
           THEREFORE UNENFORCEABLE……………………………………………14

    1.     The Arbitration Clause Is Procedurally Unconscionable ………………….……16

          a.     The Arbitration Agreement is a Contract of Adhesion and
               Oppressive………………………………………………………………..16

          b.     The Arbitration Agreement And Class Action Waiver is
               Inconspicuously Buried Towards the End of the Client Manual……...…17

          c.     The Arbitration Agreement Fails to Disclose to Customers that
               Citibank May Remove Small Claims Cases to Federal Court…………...17

          d.     Citibank Did Not Provide Plaintiffs A Copy of the American
               Arbitration Association Rules, JAMS Rules, or Arbitration Fees……….18

    2.     The Arbitration Clause is Substantively Unconscionable…………………………19

a.   The Arbitration Agreement Contains a Shortened Statute of Limitations Arguably Barring Plaintiffs' Claims……………………..…19

b.   The Arbitration Agreement Allows Citibank to Unilaterally Modify the Agreement…………………………………………….…..…21

c.   The Arbitration Agreement Will Prevent Plaintiffs From Vindicating Their Statutory Rights……………………………………21

d.   The Arbitration Clause Does Not Provide Consumers A Right To A Hearing in Their Hometown Area…………………………….23

3.   The Offending Portions Of The Arbitration Clause Cannot Be Severed……..…23

V. CONCLUSION………………………………………………………………….25

## TABLE OF AUTHORITIES

**CASES**                                                                    **Page(s)**

*Armendariz v. Found. Health Psychcare Services, Inc.*,
　　24 Cal. 4th 83 (2000)……………………..………………….…..…...……15, 16, 17, 19, 24

*AT&T Mobility v. Concepcion*,
　　131 S. Ct. 1740 (2011)……………………………………………………….....15, 22

*Banner Entertainment, Inc. v. Superior Court (Alchemy Filmworks, Inc.)*,
　　62 Cal. App. 4th 348 (1998)……...………………………………………………….9

*Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.*,
　　622 F.3d 996 (9th Cir. 2010)……………………………………………..…...16

*Bruni v. Didion*,
　　160 Cal. App. 4th 1272 (2008)……...…………………………………....14, 16, 17

*Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel*,
　　346 F.3d 360 (2d Cir. 2003)……...……………………………………………....15

*Carey v. 24 Hour Fitness, USA, Inc.*,
　　669 F.3d 202 (5th Cir. 2012)……………………………………………………12

*Circuit City Stores, Inc. v. Adams*,
　　279 F.3d 889 (9th Cir. 2002)……………………………………..……….....20, 24

*Conroy v. Citibank, N.A.*,
　　No. 10-CV-04930 SVW-AJW, slip op. (C.D. Cal. July 22, 2001)...……………………23

*Davis v. O'Melveny & Myers*,
　　485 F.3d 1066 (9th Cir. 2007)……...…………………………………………...…20

*Doctor's Associates, Inc. v. Casarotto*,
　　517 U.S. 681 (1996)……………………………………………………...14

*Dreyfuss v. Etelecare Global Solutions-U.S. Inc.*,
　　349 F. App'x 551 (2d Cir. 2009)……………………………………………...10

*Ferguson v. Countywide Credit Indus.*,
　　298 F.3d 778 (9th Cir. 2002)……...……………………………………...…24

*First Options of Chicago, Inc. v. Kaplan*,
　　514 U.S. 938 (1995)……………………………………………………...9

*Flores v. Transamerica HomeFirst, Inc.*,
    93 Cal. App. 4th 846 (2001)……………………………………………………....16

*Graham Oil Co. v. ARCO Products Co.*,
    43 F.3d 1244 (9th Cir. 1994)………………………………………………………25

*Gutierrez v. Autowest, Inc.*,
    114 Cal. App. 4th 77 (2003)……………………………………………………19

*Harris v. Blockbuster Inc.*,
    622 F. Supp. 2d 396 (N.D. Tex. 2009)…………………………………………....12

*Hines v. Overstock.com, Inc.*,
    668 F. Supp. 2d 362 (E.D.N.Y. 2009)…...………………………………………....10

*Hooters of Am., Inc. v. Phillips*,
    173 F.3d 933 (4th Cir. 1999)…...………………………………....…………21

*In re Am. Express Merchs. Litig. (Amex III)*,
    667 F.3d 204 (2d Cir. 2012)……………………………………..…………14, 15, 22

*Ingle v. Circuit City Stores, Inc.*,
    328 F.3d 1165 (9th Cir. 2003)……………………………………..…...19, 21

*J.M. Davidson, Inc. v. Webster*,
    128 S.W.3d 223 (Tex. 2003)…..……………………………………………....12

*Kanbar v. O'Melveny & Myers*,
    2011 U.S. Dist. LEXIS 79447 (N.D. Cal. July 21, 2011)…...………………………....15

*Marin Storage & Trucking, Inc. v. Benco Contracting & Eng'g, Inc.*,
    89 Cal. App. 4th 1042 (2001)………………………………………………………11

*Mayers v. Volt Management Corp.*,
    203 Cal. App. 4th 1194 (2012)…..…………………………………………....18

*Newton v. Am. Debt Servs.*,
    2012 U.S. Dist. LEXIS 22080 (N.D. Cal. Feb. 22, 2012)…………………………....10, 20

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*,
    388 U.S. 395 (1967)………………………………………………………....13

*Ragone v. Atlantic Video*,
    595 F.3d 115 (2d Cir. 2010)…..………………………………………………14

*Raniere v. Citigroup Inc.*,
  2011 U.S. Dist. LEXIS 135393 (S.D.N.Y. Nov. 22, 2011)…………..……………...…10, 16

*Revak v. SEC Realty Corp.*,
  18 F.3d 81 (2d Cir. 1994)….……………………………………………………..…13

*Rosenthal v. Great W. Fin. Sec. Corp.*,
  14 Cal. 4th 394 (1996)….……………………………………………………………9

*Sanford v. Memberworks, Inc.*,
  483 F.3rd 956 (9th Cir. 2007)….…………………………………………………..…9

*Specht v. Netscape Communications*,
  306 F.3rd 17 (2d Cir. 2002)….……………………………………………………...11

*State v. Wolowitz*,
  96 A.D.2d 47 (2nd Dep't 1983)….……………………………………………….....16

*Stirlen v. Supercuts Inc.*,
  51 Cal. App. 4th 1519 (1997)….…………………………………………...……….20

Sutherland v. Ernst & Young LLP,
  2012 U.S. Dist. LEXIS 5024 (S.D.N.Y. Jan. 13, 2012)…………………………...……22

*Trivedi v. Curexo Tech. Corp.*,
  189 Cal. App. 4th 387 (2010)….……………………………………………….......18

*Vivid Video, Inc. v. Playboy Entertainment Group, Inc.*,
  147 Cal. App. 4th 43 (2007)….……………………………………………….......9

*Windsor Mills, Inc. v. Collins & Aikman Corp.*,
  25 Cal. App. 3d 987 (1972)….……………………………………………………10, 11

## STATUTES                                                             Page(s)

9 U.S.C. § 2….………………………………………………………………………14

Business & Professions Code § 17208….………………………………………………19

Cal. Civ. Proc. Code § 1670.5(a)….……………………………………………………15

Cal. Civ. Proc. Code § 1783….………………………………………………………19

Internal Revenue Code (I.R.C.) § 6721……………………………….………………………………..7

NY CPLR § 214……………………………………..…………………………………………...…20

**<u>OTHER AUTHORITIES</u>**

Restatement (Second) of Contracts § 77…………………………………………………………12

Restatement (Second) of Contracts § 164……………………………………………………...13

## I.     INTRODUCTION

Defendant Citibank N.A. ("Citibank") seeks to compel arbitration of this dispute based on a purported arbitration agreement that Citibank claims Plaintiffs agreed to when opening the Citibank accounts at issue.  However, the Court should not compel arbitration of the dispute because (1) no arbitration agreement was ever formed; 2) the arbitration agreement is illusory; (3) the arbitration agreement is voidable as the agreement was induced by material misrepresentations; (4) the arbitration agreement cannot be performed by its own terms; and (5) the arbitration agreement is unconscionable and therefore unenforceable.

## II.    STATEMENT OF FACTS

This is a class action lawsuit against Citibank for unfair and deceptive trade practices concerning airline miles Citibank provides to new customers for opening Citibank checking and/or savings accounts.  The primary issues are the proper valuation, if any, of these awards for tax purposes and the adequacy of disclosure to customers.

**Citibank's Improper Business Practices**

Citibank regularly offers customers promotional American Airline miles as an incentive to open new checking and savings accounts.  *See* Compl. ¶ 33.[1]  Citibank fails to inform customers who receive mileage awards, however, that Citibank will report to the Internal Revenue Service ("IRS") that the mileage awards are valued at 2.5 cents per mile, even though the miles have no value to Citibank customers that can be fixed at the time they are awarded and have an average value to customers of between .76 cents per mile and 1.2 cents per mile, if redeemed.  *Id*. at ¶ 34.

---

[1] References to the complaint in this action shall be "Compl. ¶ __."

For at least the past two years, Citibank has been issuing 1099 forms to customers that sign up for the airline miles promotions based on Citibank's declared value of the miles customers received at 2.5 cents per mile.  *Id*. at ¶ 35.  The purpose of the 1099 form is so that customers will report as additional income, the value of the miles received – whether used or not. The 1099 forms are also sent to the IRS so that the IRS can assure that customers properly report the additional income on their tax returns.  Citibank is apparently the only institution that issues 1099 forms to the IRS for the receipt of airline miles.

It has long been concluded that airline miles have no taxable value to customers that can be fixed at the time they are awarded given the fact that many airline miles go unused, lack liquidity, are burdened with use restrictions, and oftentimes may expire within a short period after issuance.  *Id*. at ¶ 36.  In the case of the American Airline miles provided by Citibank, the expiration period is 18 months.  In reality, many miles go unused and thus, have no value.

Citibank customers have been furious as a result of Citibank's actions, with hundreds of them complaining on internet message boards about the tax treatment of these miles, Citibank's concealed valuation methodology, and that they would not take advantage of such offers in the future.  *Id*. at ¶ 37.  Citibank's actions are causing customers to incur and pay taxes that they should not be liable for, or incur the risk of audit, hassle and expense of challenging the 1099 form issued by Citibank.

Even if the airline miles were properly taxable, which Plaintiffs take the position that they are not, because Citibank values the miles at more than double their typical redemption worth, customers are paying more than double the income tax for the receipt of the miles.  For example, a typical promotion would provide Citibank customers with 40,000 American Airline miles, and the 1099 form sent to customers would state that the customer must report $1,000 as

additional income, amounting to 2.5 cents per mile.  Applying an average federal and state tax

rate of approximately 35%, customers are required to pay $350 in taxes for the receipt of said

40,000 airline miles.  If the airline miles were valued at a more reasonable 1 cent per share (the

middle of the range of the true average value of the miles), the tax liability would be $150.

Accordingly, even if Citibank was correct in its view that the airline miles are taxable, because

Citibank reported grossly inflated values for the airline miles, Plaintiffs, and consumers, suffered

approximately $200 each in damages (customers that only took advantage of the checking

account offer of 20,000 airline miles, and received a 1099 form, would have suffered

approximately $100 in damages under the same methodology).

Citibank does not disclose in its American Airline promotional offering materials that

Citibank will report to the IRS that its customers received miscellaneous income as the result of

the receipt of airline miles, or that the American Airline miles would be valued at 2.5 cents per

mile by Citibank, because Citibank knew that very few customers, if any, would take advantage

of the offer if the disclosures were made.  *Id*. at ¶ 39.

On January 30, 2012, United States Senator Sherrod Brown, Chairman of the U.S. Senate

Banking Subcommittee on Financial Institutions and Consumer Protection, sent a letter to

Citigroup's CEO, requesting that Citibank stop issuing 1099 forms to customers and noted that

Citibank ''arbitrarily calculates the value of each frequent flier mile as 2.5 cents.''  In a

newspaper interview response, Citibank stated that it is required by law to issue 1099 forms to

customers, and implied that it would continue the practice of valuing the airline miles at 2.5 cents

per mile without adequate disclosure.  *Id*. at ¶ 40.

In the letter, United States Senator Sherrod Brown stated, among other things:

> During these challenging economic times, middle-class families
> are pinching pennies to help pay for the cost of a flight to fly home

from college, visit an ailing relative, or see friends.   To some, signing up for a bank account in exchange for frequent-flier miles to help make a trip more affordable is an offer that is too good to resist.   However, your actions are leaving working families with the seemingly incorrect impression that when they rack up miles, they are hiking up their taxes, too.

**Plaintiff Bertram Hirsch is Financially Injured as a Result of Citibank's Unfair and Deceptive Banking Practices**

On October 6, 2010, Mr. Hirsch received an offer from Citibank in the mail stating that it was offering its Citi/AAdvantage customers with Citibank's "most rewarding AAdvantage bonus miles offer yet for new accounts."  Citibank offered 20,000 American Airline bonus miles to new customers that opened up a checking account and either 1) used the account for direct deposits; 2) made two or more electronic bill payments from the account; or 3) made five or more payments with the debit card associated with the account.  Citibank also offered 20,000 additional miles to new customers that opened up a savings account with a minimum deposit of $25,000.  *See* the Declaration Of Bertram Hirsch In Support Of Plaintiffs' Opposition To Defendant's Motion To Compel Arbitration And Stay The Action (the "*Hirsch Decl.*"), at ¶ 2.

Mr. Hirsch was interested in the promotion but concerned as to whether the airline miles would be taxable because the fine print in the offer letter merely stated, "Customer is responsible for taxes, if any."  *Id.* at ¶ 3.

Mr. Hirsch, a semi-retired lawyer had to be careful that his earned income and income from miscellaneous sources did not exceed a certain threshold because he could lose a portion of his social security retirement benefits if the threshold was exceeded.  *Id.* at ¶ 4.

Mr. Hirsch went to his local branch in Great Neck, New York, and asked the Citibank representative if the airline miles in the promotion were taxable, to which the Citibank representative responded that they were not.  *Id.* at ¶ 5.

4

Mr. Hirsch then opened his checking and savings accounts, fulfilled the remaining terms of the offer, and received his 40,000 American Airline miles in early 2011.  *Id.* at ¶ 6.

When Mr. Hirsch opened up his checking and savings account, he was not informed by Citibank that any disputes related to the checking or savings account were subject to an arbitration agreement, nor did Citibank provide Mr. Hirsch with a copy of any arbitration agreement.  Similarly, there was no discussion about whether Mr. Hirsch was agreeing to a class action waiver or reduction in any of his rights under the law.  *Id.* at ¶¶ 11-21.

In January 2012, Mr. Hirsch received a 1099 form from Citibank stating that he must report $1,000 as miscellaneous income.  Mr. Hirsch did not understand what the 1099 was for and went back to his local branch.  At the branch, Citibank representatives also did not know what the 1099 was for, again confirmed that the 40,000 American Airline miles that Mr. Hirsch received were not taxable, and stated that he should initiate an internal investigation with Citibank in an attempt to resolve the issue.  Mr. Hirsch did so.  *Id.* at ¶ 7.

Finally, Mr. Hirsch received a letter from Citibank stating that the American Airline miles were taxable under federal law and that the bank was correct in reporting the income to the IRS as $1,000.  No Internal Revenue Code provision or associated regulation was referenced.  *Id.* at ¶ 8.

Even though Citibank values the 40,000 miles that Mr. Hirsch received at 2.5 cents per mile, or $1,000, Mr. Hirsch's vehemently disagrees with that value and has not redeemed any of the 40,000 American Airline miles he received from Citibank.  *Id.* at ¶ 9.

If Citibank adequately disclosed that Mr. Hirsch would have had to report $1,000 in additional miscellaneous income for tax purposes as a result of receiving the 40,000 American Airline miles, he would have never opened up a bank account with Citibank.  *Id.* at ¶ 10.

**Plaintiff Igor Romanov is Financially Injured as a Result of Citibank's Unfair and Deceptive Banking Practices**

Citibank offered Mr. Romanov a bonus of 40,000 American Airline miles if he opened up an account with an initial deposit of $25,000 at Citibank and used his debit card for a certain amount of times thereafter.  *See* Declaration Of Igor Romanov In Support Of Plaintiffs' Opposition To Defendant's Motion To Compel Arbitration And Stay The Action (the "*Romanov Decl.*"), at ¶ 2.

In, or around, November 2010, Mr. Romanov opened up an account at Citibank, deposited a minimum of $25,000, used his debit card for the required amount of times, and soon thereafter, received his 40,000 American Airline miles.  *Id*. at ¶ 3.

When Mr. Romanov opened up his checking and savings account, he was not informed by Citibank that any disputes related to the checking or savings account were subject to an arbitration agreement, nor did Citibank provide Mr. Romanov with a copy of any arbitration agreement.  Similarly, there was no discussion about whether Mr. Romanov was agreeing to a class action waiver or reduction in any of his rights under the law.  *Id*. at ¶¶ 9-17.

In early 2012, Mr. Romanov received a 1099 form from Citibank stating that he must report $1,000 as additional income on his tax return, for the 40,000 American Airline miles he received.  This amounts to 2.5 cents per mile.  *Id*. at ¶ 4.

Mr. Romanov was never informed that he would have to pay income tax on the American Airline miles or that the income was based on a grossly overstated value of 2.5 cents per mile.  *Id*. at ¶ 5.

If Citibank adequately disclosed that Mr. Romanov would have had to report $1,000 in additional income for tax purposes as a result of receiving the 40,000 American Airline miles, he would have never opened up a bank account with Citibank.  *Id*. at. ¶ 6.

6

Mr. Romanov complained to Citibank about the 2.5 per cent valuation.  Mr. Romanov offered to sell airline miles back to Citibank and, alternatively, requested that Citibank help him pay the taxes on the airline miles.  Citibank declined to help him and stated that there was nothing that Citibank could do about it.  *Id*. at ¶ 7.

In January 2012, Mr. Romanov filed a small claims case against Citibank in Los Angeles Superior Court, alleging that Citibank sent him a 1099 form claiming that he received $1,000 from Citibank when he did not receive any money.  *Id*. at ¶ 8.  Citibank subsequently removed Mr. Romanov's small claims case to the United States District Court, Central District of California, arguing that his claim depends on the resolution of a substantial question of federal law – i.e., whether Citibank wrongfully issued him an IRS Form 1099.  Citibank claims that the requirement to issue a form 1099 is mandated by the Internal Revenue Code and associated Treasury Regulations, and that failure to issue a 1099 form may result in penalties under I.R.C. § 6721.  *See* Exhibit A to the Declaration of James C. Kelly in Support of Plaintiffs' Opposition To Defendant's Motion To Compel Arbitration And Stay The Action (the "*Kelly Decl.*") (attaching Citibank's Notice of Removal).  Mr. Romanov has sought to stay his individual action in California pending the resolution of this action, however, Citibank has refused to agree to a stay of his individual action.  *Kelly Decl.* ¶ 2.

## III.    PROCEDURAL HISTORY

Within approximately one month after receiving the 1099 forms from Citibank and discovering that Citibank reported the American Airline miles as income to the IRS at a highly disputed value, on February 14, 2012, Plaintiffs, on behalf of themselves and all others similarly-situated, filed this action against Citibank seeking: 1) monetary damages fully compensating all individuals and entities for the taxes that they paid or owe and any other financial injury suffered

7

as a result of Citibank's deceptive practices, including the lost opportunity of investment for the money provided to Citibank in exchange for the airline miles; 2) injunctive relief requiring Citibank to clearly disclose in future airline miles promotions: a) that Citibank will report to the IRS that a customer has received miscellaneous taxable income as a result of the receipt of the airline miles; and b) the amount of additional income that would be reported by Citibank on the 1099; and 3) such other relief as the Court deems necessary and appropriate.[2]

On March 16, 2012, Citibank filed a Motion to Compel Arbitration and Stay the Action ("Motion to Compel Arbitration").  Citibank claims that Plaintiffs, in connection with opening up their bank accounts at Citibank, entered into binding arbitration agreements that require Plaintiffs' claims to be arbitrated on an individual, non-class action, basis.  Citibank claims that the arbitration agreement and a class action waiver is contained in a document titled "Client Manual," and that it was and is Citibank's practice to provide a copy of the Client Manual to new customers at the time they open up a deposit account.

Plaintiffs hereby oppose Citibank's Motion to Compel Arbitration on the ground that the arbitration agreement at issue is invalid and/or unenforceable under California and/or New York law.

---

[2] At least one other class action complaint has been filed against Citibank.  The complaint, titled *Amer Safadi v. Citibank N.A.*, 12cv1356 (N.D. Cal. March 19, 2012), alleges substantially the same claims in this action on behalf of a nationwide class, but also asserts that Citibank committed fraud, arguing that Citibank fraudulently issued the 1099 forms, and overvalued the airline miles so that it could obtain a greater tax deduction to reduce its tax liability.  *See* Exhibit B to the *Kelly Decl*.  In addition, at least one other small claims case was filed against Citibank related to the airline miles, which Citibank subsequently removed to federal court.  *See* Exhibit C to the *Kelly Decl*.  Since Plaintiffs filed this action, Plaintiff's counsel has received calls from numerous other potential class members, including Citibank customers from New Jersey and Illinois, seeking to file lawsuits against Citibank.  *Kelly Decl*. at ¶ 3.

IV.     ARGUMENT

A.      NO AGREEMENT TO ARBITRATE WAS FORMED

  "[T]he petitioner bears the burden of establishing the existence of a valid agreement to arbitrate[.]" *Banner Entertainment, Inc. v. Superior Court (Alchemy Filmworks, Inc.)*, 62 Cal. App. 4th 348, 356 (1998).

    In deciding whether an agreement to arbitrate was formed, the Supreme Court has instructed the courts to look to *state law* governing the formation of contracts. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995) ("when deciding whether the parties agreed to arbitrate a certain matter…courts generally…should apply ordinary state law principles that govern the formation of contracts."). Because Plaintiff Hirsch opened up his account in New York, New York law governs his relationship with Citibank. Plaintiff Romanov opened up his account in California, therefore, California law governs his relationship.

    The question of whether an agreement to arbitrate was ever formed is for the court to decide, not the arbitrator. *Vivid Video, Inc. v. Playboy Entertainment Group, Inc.*, 147 Cal. App. 4th 434, 436 (2007). If there never was an agreement to arbitrate, there is no right to force the matter before an arbitrator. *See Sanford v. Memberworks, Inc.*, 483 F.3rd 956, 963-964 (9th Cir. 2007) (vacating order compelling arbitration and remanding for determination of whether contract was formed, after arbitrator found no contract existed but still issued award).

    There is no valid agreement to arbitrate in this action because Plaintiffs did not knowingly assent to any arbitration terms. Under California law, Citibank has the burden of proving the existence of an arbitration agreement by a preponderance of the evidence. *Rosenthal v. Great W. Fin. Sec. Corp.*, 14 Cal. 4th 394, 413 (1996). Contract law measures assent by an objective standard that takes into account both what the offeree said, wrote, or did and the

transactional context in which the offeree verbalized or acted.  The defendant must show a clear

mutual manifestation of assent.  *Windsor Mills, Inc. v. Collins & Aikman Corp.*, 25 Cal. App. 3d

987, 992-993 (1972).  Furthermore, "an offeree, regardless of apparent manifestation of his

consent, is not bound by inconspicuous contractual provisions of which he was unaware,

contained in a document whose contractual nature is not obvious."  *Id.* at p. 993; *see also Hines

v. Overstock.com, Inc.*, 668 F. Supp. 2d 362, 367 (E.D.N.Y. 2009) (consumer who made on-line

purchase had "no actual notice" of terms, including arbitration clause, when she was not

prompted to review the terms before completing purchase).  Here, Defendants have offered no

evidence whatsoever from which the court could glean these crucial facts regarding the

transactional context, actual notice, or assent.

Under New York law, a party will not be compelled to arbitrate absent the parties' clear,

explicit and unequivocal agreement.  *Raniere v. Citigroup Inc.*, 2011 U.S. Dist. LEXIS 135393,

at *21-22 (S.D.N.Y. Nov. 22, 2011).  Where there was no "meeting of the minds," an arbitration

agreement cannot be enforced.  *Dreyfuss v. Etelecare Global Solutions-U.S. Inc.*, 349 F. App'x

551, 553 (2d Cir. 2009).  Citibank provides no evidence of a clear, explicit, and unequivocal

agreement by Plaintiffs to arbitrate their claims.

Although Citibank claims that it was, and is, the "practice" for the bank to provide its

Client Manual, which contains an arbitration agreement and class action waiver, to new

customers who open up accounts, Plaintiffs did not receive the Client Manual.  *See* the *Haslam

Decl.*[3], at ¶ 8; *Hirsch Decl.* at ¶ 14; *Romanov Decl.* at ¶ 12.  Moreover, Citibank provides no

evidence that Plaintiffs *actually* received the Client Manual, or that they otherwise assented to

the arbitration agreement.  *See Newton v. Am. Debt Servs.*, 2012 U.S. Dist. LEXIS 22080, at *13-

---

[3] The Declaration of Joan Haslam (referred to herein as the "*Haslam Decl.*"), dated March 14,
2012, was filed with Citibank's Motion to Compel Arbitration.

14 (N.D. Cal. Feb. 22, 2012) (finding no arbitration agreement was formed, even where signed application referenced the arbitration agreement, when provided no evidence that the actual arbitration agreement was made available to plaintiff when she signed the application).

Although Citibank provides a signature card that Plaintiffs signed when they opened up their checking and savings accounts, nowhere does the signature card even refer to any arbitration agreement, nor does it refer to the "Client Manual" that contains the proffered arbitration agreement.  *See* Exhibits 1 and 2 to the *Haslam Decl*.  In addition, although the promotional airlines offer letter that Plaintiffs received from Citibank contained terms and conditions, nowhere does it refer to an arbitration agreement or incorporate the Client Manual by reference.  *See* Exhibit A to the Complaint.

Here, Citibank has presented absolutely no competent evidence bearing on assent, such as evidence of how the contract terms were presented, negotiated and agreed to.  On the other hand, Plaintiffs presented competent evidence that they did not have knowledge that they were entering into a contract requiring arbitration.  *Windsor Mills,* 25 Cal. App. 3d at 992 ("an offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he is unaware, contained in a document whose contractual nature is not obvious."); *see also Marin Storage & Trucking, Inc. v. Benco Contracting & Eng'g, Inc.*, 89 Cal. App. 4th 1042, 1049 (2001) (same).[4]

---

[4] "It is true that "[a] party cannot avoid the terms of a contract on the ground that he or she failed to read it before signing."  *Marin Storage & Trucking*, 89 Cal. App. 4th at 1049.  But courts are quick to add: "'An exception to this general rule exists when the writing does not appear to be a contract and the terms are not called to the attention of the recipient.  In such a case, no contract is formed with respect to the undisclosed term.'"  *Id*; *see also Specht v. Netscape Communs. Corp.*, 306 F.3d 17, 30 (2d Cir. N.Y. 2002).  Here, Citibank has no evidence that the terms of the purported contract were ever actually brought to Plaintiff's attention.  The only evidence is that they were not.

**B.      THE ARBITRATION AGREEMENT IS ILLUSORY AND THEREFORE NEVER EXISTED**

The arbitration agreement allows Citibank to unilaterally modify the agreement without limitation, notice, or Plaintiffs' consent.  *See* Exhibit 3 to the Haslam Decl., at p. 8.   This amounts to a one-sided escape hatch for Citibank.   Such a provision renders the arbitration agreement illusory and unenforceable because it allows the company to retroactively modify or terminate the agreement without notice.  *See Carey v. 24 Hour Fitness, USA, Inc.,* 669 F.3d 202, 209 (5th Cir. 2012) (finding an arbitration provision illusory and unenforceable because 24 Hour Fitness retained the unilateral right to modify or terminate the arbitration provision); *Harris v. Blockbuster Inc.*, 622 F. Supp. 2d 396, 398-399 (N.D. Tex. 2009) (finding Blockbuster's arbitration agreement with its customers illusory because the agreement provides "Blockbuster reserves the right to modify the Terms and Conditions, including the section that contains the arbitration provision, 'at its sole discretion' and 'at any time...'"); *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 231 (Tex. 2003) (collecting cases); Restatement (Second) of Contracts § 77 cmt. a, illus. 2 (1979).

**C.       THE ARBITRATION AGREEMENT DOES NOT APPLY TO CHECKING ACCOUNTS**

The Client Manual expressly states that it applies only to "deposit, Ready Credit®, Checking Plus ® or Checking Plus ® (variable rate) accounts."  Exhibit 3, to the *Haslam Decl*. at 44.  However, the checking account that Plaintiff Hirsch opened was a "regular checking" account.  *See* the *Hirsch Decl*. at ¶ 15(c) (stating that he denied Citibank's Checking Plus product).  The Client Manual does not govern "regular checking" accounts.  Accordingly, Citibank's motion to compel arbitration should be denied on this ground alone.

**D.    THE ARBITRATION AGREEMENT IS VOIDABLE BECAUSE CITIBANK MISREPRESENTED ITS TERMS**

Even if Citibank can show that Plaintiffs somehow agreed to the arbitration agreement, Plaintiffs request that the Court find the arbitration agreement void because the arbitration agreement contains material misrepresentations by Citibank.  *See Revak v. SEC Realty Corp.*, 18 F.3d 81, 91 (2d Cir. 1994) ("[F]raud in the inducement consists of misrepresentations that cause the maker of the note to enter the transaction."); Restatement (Second) of Contracts, § 164(1) ("If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient."); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-404 (1967) (permitting federal courts to adjudicate claims of "fraud in the inducement of the arbitration clause itself" because such claims "g[o] to the 'making' of the agreement to arbitrate").

Citibank induced customers to agree to the arbitration agreement by stating that it excludes disputes filed by customers in small claims court.  *See* Exhibit 1 to the *Haslam Decl.* at 44.  Such a provision is enticing to customers as it provides them with a low cost, *pro se* friendly, neutral and unbiased court to litigate their claims.  However, the provision failed to disclose that Citibank would remove small claims to federal court at its discretion (as evidenced by Citibank's removal of at least two claims filed in small claims court), even if the customer did not assert any federal claims, thereby, depriving consumers of the small claims process and subjecting the claims to arbitration.  This is a material misrepresentation as it deprives customers of significant rights that they believed that they had under the agreement.  Accordingly, Plaintiffs request that the Court void the arbitration agreement.

### E.   THE ARBITRATION AGREEMENT CANNOT BE PERFORMED BY ITS OWN TERMS

The arbitration agreement stated that the consumer *must* select either the American Arbitration Association ("AAA") or JAMS.  Exhibit 3, to the *Haslam Decl.* at 45.  However, both AAA and JAMS state that they will not administer consumer arbitrations if a party is precluded from seeking remedies in small claims court for disputes or claims within the scope of its jurisdiction.  *See* Exhibits D (at p. 2, ¶ 1), E (at p. 1), and F (at p. 2) to the *Kelly Decl*.  Here, Citibank has taken action that precludes Plaintiffs, and costumers, from obtaining relief from small claims court, thus rendering arbitration impossible.

### F.   THE ARBITRATION CLAUSE IS UNCONSCIONABLE AND THEREFORE UNENFORCEABLE

Section 2 of the Federal Arbitration Act ("FAA") states that arbitration clauses are enforceable "save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. section 2; *In re Am. Express Merchs. Litig. (Amex III)*, 667 F.3d 204 (2d Cir. 2012).  The U.S. Supreme Court has stated that arbitration clauses may be voided under state law, on grounds that would generally apply to any contract provision.  *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 685 (1996).

Unconscionability is one of the grounds that exist for the revocation of any contract.  An arbitration provision may be struck down if it is unconscionable.[5]  *Id*. at p. 687; *Ragone v. Atlantic Video*, 595 F.3d 115 (2d Cir. 2010) ("…an arbitration agreement may contain terms so onerous as to render it unenforceable under Section 2 of the FAA.").  "[Q]uestions of contractual validity relating to the unconscionability of [an] arbitration agreement must be resolved first, as a

_____

[5] The court must determine if the provision is unconscionable; not the arbitrator.  *In re Am. Express Merchs. Litig. (Amex III)*, 667 F.3d at 210; *Bruni v. Didion*, 160 Cal. App. 4th 1272, 1290 (2008).

matter of state law, before compelling arbitration pursuant to the FAA." *Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel*, 346 F.3d 360, 365 (2d Cir. 2003) (per curiam).

Under California law, courts may refuse to enforce a contract where, at the time of its formation, it was unconscionable, or may limit the application of any unconscionable clause. Cal. Civ. Code § 1670.5(a).[6]  A finding of unconscionability has both a procedural and substantive component.  *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 114 (2000).  While procedural unconscionability focuses on the element of "'oppression' or 'surprise' due to unequal bargaining power," substantive unconscionability centers on "'overly harsh,' or 'one-sided' results."  *Id.*  Both components must be present before a court may refuse to enforce a contract.  *Id.*  However, they need not be present to the same degree; "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa."  *Id.*

---

[6] *Concepcion* did not reject an unconscionability defense to arbitral agreements.  In overruling the *Discover Bank* rule, the Supreme Court sought merely to preempt state laws that categorically defined an arbitration agreement as unconscionable.  *See AT&T Mobility v. Concepcion,* 131 S. Ct. 1740, 1748 (2011) (noting that the saving clause in FAA § 2 preserves generally applicable contract defenses); *see also Kanbar v. O'Melveny & Myers,* 2011 U.S. Dist. LEXIS 79447, at *24 (N.D. Cal. July 21, 2011) (holding that an "unconscionability determination based on state law is not preempted by the FAA").  California's unconscionability defense, codified in California Civil Code section 1670.5, does not create a per se rule invalidating arbitration clauses, but instead looks more generally to the facts and circumstances of each case to determine whether a contract is unconscionable.  Even after the Supreme Court's decision, "[t]he doctrine of unconscionability can override the terms of an arbitration agreement and the parties' expectations in connection therewith."  *Kanbar,* 2011 U.S. Dist. LEXIS 79447, at *16.  *In re Am. Express Merchs. Litig. (Amex III)*, 667 F.3d at 219 ("We do not hold today that class action waivers in arbitration agreements are per se unenforceable…we hold that each waiver must be considered on its own merits, based on its own record, and governed with a healthy regard for the fact that the FAA 'is a congressional declaration of a liberal federal policy favoring arbitration agreements.'") (citation omitted).  Accordingly, *Concepcion* does not affect the traditional analysis used to determine whether an arbitration clause is unconscionable.

Similarly, under New York law, a finding of unconscionability requires a showing that a contract is both procedurally and substantially unconscionable.  *Raniere*, 2011 U.S. Dist. LEXIS 135393, at *30-31.  "The procedural element of unconscionability concerns the contract formation process and the alleged lack of meaningful choice; the substantive element looks to the content of the contract[, per se]."  *State v. Wolowitz*, 96 A.D.2d 47, 67 (2nd Dep't 1983).

Here, because the arbitration agreement at issue is so one-sided and unfair, the Court should find that it is unenforceable.

### 1.    The Arbitration Clause Is Procedurally Unconscionable

#### a.    The Arbitration Agreement is a Contract of Adhesion and Oppressive

The procedural component of unconscionability focuses on two factors: oppression and surprise.  *Armendariz*, 24 Cal. 4th at 114.  "'Oppression' arises from an inequality of bargaining power which results in no real negotiation and 'an absence of meaningful choice,' [whereas] '[s]urprise' involves the extent to which the supposedly agreed-upon terms of the bargain are hidden in a prolix printed form drafted by the party seeking to enforce the disputed terms."  *Bruni*, 160 Cal. App. 4th at 1288.  "California law treats contracts of adhesion, or at least terms over which a party of lesser bargaining power had no opportunity to negotiate, as procedurally unconscionable to at least some degree."  *Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.*, 622 F.3d 996, 1004 (9th Cir. 2010).  Procedural unconscionability involves considerations such as whether the contract term was drafted by the more powerful party and imposed upon the weaker party on a take-it-or-leave-it basis.  "A finding of a contract of adhesion is essentially a finding of procedural unconscionability."  *Flores v. Transamerica HomeFirst, Inc.*, 93 Cal. App. 4th 846, 853-854 (2001).

16

In this case, the element of oppression is present, which renders the arbitration agreement procedurally unconscionable.  Here, assuming, *arguendo*, Plaintiffs actually assented to the arbitration agreement, it was provided to them on a take-it-or-leave-it basis, with no opportunity to opt-out of the arbitration agreement or negotiate its terms.  Plaintiffs never once discussed arbitration or a waiver, or limitation, of legal rights.  *Hirsch Decl*. at ¶¶ 11-20; *Romanov Decl*. at ¶¶ 9-16.  Because Plaintiffs had no bargaining power and were not given an opportunity to negotiate the terms of the arbitration agreement, it is a contract of adhesion, oppressive, and, thus, procedurally unconscionable.

      **b.**    **The Arbitration Agreement And Class Action Waiver is Inconspicuously Buried Towards the End of the Client Manual**

The second element of procedural unconscionability is surprise.  Surprise is a factor in procedural unconscionability.  *Armendariz*, 24 Cal. 4th at 114.  Here, the location of arbitration agreement and class action waiver is at the end of a 53 page, dense, pre-printed, document (i.e., the "Client Manual") – which was not even given to Plaintiff - where the consumer is not required to sign or otherwise indicate that the consumer reviewed the clause, does relatively little to notify the consumer that such clause exists.  *See* Exhibit 3 to the *Haslam Decl*., at 44.  Even if the Client Manual was presented to Plaintiffs, the class action waiver is buried deep in back of the manual, with inconspicuous lettering and type font.  *See Bruni*, 160 Cal. App. 4th at 1293 (finding surprise where arbitration clause was buried in the back of a 30 page document and plaintiffs were never asked to sign or initial the booklet, much less the arbitration provisions).

      **c.**    **The Arbitration Agreement Fails to Disclose to Customers that Citibank May Remove Small Claims Cases to Federal Court**

The arbitration agreement appears to be consumer friendly because it purports to exclude disputes filed by customers in small claims court.  Such a provision would be enticing to

customers because small claims provides consumers with a low cost, *pro se* friendly, neutral and unbiased court to litigate their claims.  However, the consumer friendly provision is nothing but a legal fiction.  Here, Mr. Romanov filed his action in small claims, yet Citibank removed the matter to federal court, where it could seek to impose the unconscionable arbitration provision. At least one other Citibank customer had his small claim removed to federal court.  *See* Exhibits A and C to the *Kelly Decl.*  Citibank never disclosed the consumer friendly term was essentially meaningless because Citibank reserved the right to remove small claims to federal court at its discretion, even if the customer did not assert any federal claims.  Such a provision is procedurally unconscionable as it deprives consumers of the expected rights that they had under the agreement, namely to use the small claims court.

d. **Citibank Did Not Provide Plaintiffs A Copy of the American Arbitration Association Rules, JAMS Rules, or Arbitration Fees**

Although the Citibank arbitration agreement requires the arbitration to be conducted by either the American Arbitration Association ("AAA") or JAMS, it doesn't specify which set of the numerous AAA or JAMS rules apply or what fees must be paid by the consumer.  The American Arbitration Association and JAMS have various rules and fees concerning different types of arbitrations, some of which require filing fees that are several thousand dollars just to initiate an action.  *See* http://www.adr.org and http://www.jamsadr.com. Thus, consumers are left to speculate and be surprised by the eventual set of rules or fees applicable to any such arbitration.  *See Mayers v. Volt Management Corp.*, 203 Cal. App. 4th 1194, 1212 (Cal. App. 4th Dist. 2012) ("The requirement that plaintiff abide by a set of rules promulgated by the AAA, which were not provided to him, much less identified with any clarity, is a significant defect that permeates the agreement with unconscionability."); *Trivedi v. Curexo Tech. Corp.*, 189 Cal.

App. 4th 387, 393 (2010) ("failure to provide a copy of the arbitration rules...supported a finding of procedural unconscionability.").

The AAA and JAMS have special rules for consumers that cap the amount small claims customers would pay to initiate and maintain arbitration to $125 and $250, respectively.  See Exhibit D (at p. 3, ¶ 7) and E (at p. 1) to the *Kelly Decl*.  Instead of disclosing these fees, Citibank led customers to believe that arbitration would be more expensive by stating that the party initiating the arbitration shall pay the initial filing fee and that Citibank would only pay the fees and costs for the first day of any arbitration hearing.  *See* Exhibit 3 to the *Haslam Decl*., at 45.  Citibank drafted the rules this way so to make it difficult for consumers to determine the rules and costs for any disputes with Citibank.

### 2.       The Arbitration Clause is Substantively Unconscionable

"Substantive unconscionability centers on the 'terms of the agreement and whether those terms are so one-sided as to shock the conscience.'" *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1172 (9th Cir. 2003).  An arbitration provision is substantively unconscionable if it is "overly harsh" or generates "'one-sided' results." *Armendariz*, 24 Cal. 4th at 114.  This can be shown if the disputed provisions of the agreement fall outside the "'reasonable expectations' of the non-drafting party or is 'unduly oppressive.'" *Gutierrez v. Autowest, Inc.,* 114 Cal. App. 4th 77, 88 (2003) (citation omitted).

### a.       The Arbitration Agreement Contains a Shortened Statute of Limitations Arguably Barring Plaintiffs' Claims

Plaintiff Romanov is entitled to a statutory three-year limitations period for his Consumer Legal Remedies Act claim (Cal. Civ. C. § 1783), and a four-year limitations period for his Unfair Competition Law claim (Bus. & Prof. C. § 17208).  Plaintiff Hirsch is entitled to a three-year

statue of limitations for his New York General Business Law deceptive practices claim (NY

CPLR § 214).

However, Citibank's Client Manual states, "...an action, proceeding, or arbitration, by

you to enforce an obligation, duty or right arising under this Agreement or by law with respect to

your account or any account service must be commenced within (1) year after the cause of action

accrues…"  Exhibit 3 to the *Haslam Decl.* at 9.  Such a provision is unconscionable.  Forcing

plaintiffs to comply with a shortened limitations period is oppressive.  *Davis v. O'Melveny &*

*Myers*, 485 F.3d 1066, 1076 (9th Cir. 2007) (applying California law).  An arbitration clause that

"imposes a strict one year statute of limitations" is substantively unconscionable.  *Circuit City*

*Stores v. Adams*, 279 F.3d 889, 894 (9th Cir. 2002) (applying California law); *see also Newton v.*

*Am. Debt Servs.*, 2012 U.S. Dist. LEXIS 22080, at *46-47 (N.D. Cal. Feb. 22, 2012); *Stirlen v.*

*Supercuts Inc.*, 51 Cal. App. 4th 1519, 1542 (1997) (time limitation is unconscionable).

The shortened statute of limitations is even more shocking as it has arguably barred

Plaintiffs' claims as a result of the facts in this case.  Plaintiffs' claims, arguably, began to accrue

at the time that they opened up their Citibank account – when Citibank should have informed

them that it would be issuing a 1099 form to the IRS and that Citibank valued the airline miles at

2.5 cents per mile.  Plaintiffs opened their accounts on October 25, 2010.  By the time that

Plaintiffs first learned that Citibank issued the 1099 forms to the IRS, which was in January

2012, when Plaintiffs also received the 1099 forms from Citibank, Plaintiffs claims already,

arguably, accrued.[7]

---

[7] Plaintiffs also allege claims for breach of contract, negligent misrepresentation, and unjust
enrichment that also arguably accrued.

> **b.** **The Arbitration Agreement Allows Citibank To Unilateral Modify the Agreement**

As explained above, Citibank's Client Manual allows it to unilaterally change (add to, delete, alter, terminate) the agreement without Plaintiffs' consent, even without prior notice, merely by posting the information in its offices, on its website, or otherwise making it available. Exhibit 3 to the *Haslam Decl.* at 8.  In fact, nothing prevents Citibank from modifying the arbitration agreement to its benefit during the actual arbitration.

Such a provision is so inherently unfair that it renders the arbitration agreement unconscionable.  *See Ingle*, 328 F.3d at 1179 (finding a provision allowing one party "the unilateral power to terminate or modify the contract…substantively unconscionable."); *Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 939 (4th Cir. 1999) (upholding district court's denial to compel arbitration because, among other things, the arbitration agreement allowed Hooters to modify the rules of arbitration without limit and "[n]othing in the rules even prohibits Hooters from changing the rules in the middle of an arbitration proceeding.").

> **c.** **The Arbitration Agreement Will Prevent Plaintiffs From Vindicating Their Statutory Rights**

Citibank's Client Manual contains a provision purportedly prohibiting class action lawsuits or class arbitrations.  Exhibit 3 to the *Haslam Decl.* at 44.  The arbitration agreement also prohibits two or more persons from joining or consolidating their claims in arbitration.  *Id.* Said provisions are unconscionable as they were designed to insulate Citibank from liability by making it costlier for individuals to vindicate their statutory rights.

Here, not only will Plaintiffs have to risk a minimum of $125 to initiate the arbitration ($125 the amount AAA charges the consumer for arbitration) – which is already a significant percent of the approximately $200-$350 in damages that they each suffered (see calculation of

21

average damages for a 40,000 mile airline promotion, *supra,* at p. 2-3), but, due to the complexity of Plaintiffs' claims, they would have to retain a tax expert to show that Citibank's valuation of the airline miles was incorrect, and that the bank should not have issued 1099 forms to its customers.

Plaintiffs obtained a price quote from one potential expert amounting to $10,000-$15,000 for an opinion on the relevant tax issues and valuation of airline miles.  The price quote did not include testimony in a proceeding.  *See* Exhibit G to the *Kelly Decl.*

Plaintiffs simply cannot pursue an individual arbitration, or an individual action, when faced with such risks of a huge monetary loss, especially if the Court finds that the provision shortening the statue of limitations for Plaintiffs' claims is enforceable.[8]  Indeed, Plaintiffs stated

---

[8] *Concepcion* does not require enforcement of a class action waiver where the evidence shows that the arbitration agreement is unconscionable.  The problem, according to the U.S. Supreme Court, was that California's *Discover Bank* rule was so "toothless and malleable" that it would nonetheless invalidate AT&T's class action ban -- even though the plaintiffs could vindicate their rights in individual arbitration.  *Concepcion*, 131 S. Ct. at 1750.  The Court found that the arbitration agreement was not designed in a manner such that the claims would go unresolved because it provided that "in the event that a customer receives an arbitration award greater than AT&T's last written settlement offer…AT&T…[would]…pay a $7,500 minimum recovery and twice the amount of the claimant's attorney's fees."   In addition, the underlying issue in *Concepcion* was that AT&T charged plaintiff sales tax after purchasing a phone that was advertised as a free phone.  The claim did not have the complex valuation issues here, and there was no dispute requiring expert testimony concerning the Internal Revenue Code.   Unlike *Concepcion*, Plaintiffs have developed an evidentiary record establishing that a class action ban would, as a factual matter, prevent consumers, including Plaintiffs, from having a meaningful chance to pursue their particular legal claims.  *In re Am. Express Merchs. Litig. (Amex III)*, 667 F.3d at 219 (refusing to enforce arbitration agreement because a class action waiver would prevent plaintiffs from pursuing their statutory rights); *Sutherland*, 2012 U.S. Dist. LEXIS 5024, at *32-33 (same).  Furthermore, the remaining provisions of AT&T's arbitration agreement in *Concepcion* were in stark contrast to the provisions in the arbitration agreement here.   For example, it provided customers with an easy to fill-out form on AT&T's website to initiate the arbitration, it stated that AT&T must pay all costs for arbitration, it stated that the customer may choose whether the arbitration proceeds in person, by telephone, or based only on submissions, and it stated that that arbitration must take place in the county in which the customer is billed. *Concepcion*, 131 S. Ct. at 1744.

that they would not continue to pursue, or initiate, an individual lawsuit or individual arbitration proceeding, if they would be required to pay for a tax expert or airline mileage valuation expert. *See Hirsch Decl*. at ¶ 21; *Romanov Decl*. at ¶ 17.  Moreover, even the potential expert in this action stated that it "seems impractical, if not cost prohibitive, for one consumer to incur the costs of the required analysis needed to challenge Citibank's valuation methodology."  *See* Exhibit G to the *Kelly Decl*. at ¶ 7.

### d.    The Arbitration Clause Does Not Provide Consumers A Right To A Hearing in Their Hometown Area

The Arbitration Agreement provides that the hearing will be conducted in the same city as the U.S. district court closest to the customer's home address.  This would require Plaintiff Hirsch to travel to New York City for the hearing because his home address is in Long Island, which is the jurisdiction of the Eastern District of New York (located in Brooklyn).  This is unfair to Plaintiff Hirsch, especially since he opened up his account at his local Citibank branch in Great Neck, New York.  Indeed, JAMS states in its rules that in order for it to administer a consumer arbitration agreement, the consumer must have a right to an in-person hearing in his or her hometown area.  *See* Exhibit D (at p. 2, ¶ 5) to the *Kelly Decl*.[9]

### 3.    The Offending Portions Of The Arbitration Clause Cannot Be Severed

The arbitration agreement states that "[i]f any portion of this arbitration provision is deemed invalid or unenforceable, the entire arbitration provision shall not remain in force.  No

---

[9] While Citibank has done a good job of presenting cases which hold that any one of these scenarios in isolation are insufficient to hold an arbitration agreement to be unconscionable, none of the cited cases consider all of these issues together.  In addition, unlike the plaintiff in *Conroy v. Citibank, N.A.*, No. 10-CV-04930 SVW-AJW, slip op. (C.D. Cal. July 22, 2001), Plaintiffs here have presented sufficient evidence to show that at least one costly expert would be required in order to vindicate their rights.  Plaintiffs urge this Court to consider the totality of the circumstances presented.  Together these issues all lead to the same conclusion.  A very large company pushing the envelope on what is considered acceptable in an arbitration agreement.

provision of this arbitration provision may be amended, severed, or waived, absent a written agreement between you or us."  Exhibit 3 to the *Haslam Decl*. at 46.  Accordingly, by its own terms, if the Court finds any of the provisions in the arbitration agreement are invalid or unenforceable, the entire arbitration agreement is deemed unenforceable.

Even if the entire arbitration agreement was not deemed unenforceable by its terms, because the terms of the arbitration agreement are so one-sided in favor of Citibank, the entire arbitration agreement should be invalidated.

An arbitration agreement is substantively unconscionable as a whole where it reflects an "insidious pattern" favoring the drafter.  *Ferguson v. Countywide Credit Indus*., 298 F.3d 778, 787 (9th Cir. 2002) (applying California law).  The California Supreme court has held that when the arbitration agreement is permeated by unconscionability, the entire agreement must be invalidated.  *Armendariz,* 24 Cal. 4th at 124.  The court found an agreement to be so permeated where it (1) contained not one but two unlawful provisions, and (2) lacked mutuality.  *Id*. at 124-125.  The court held that such multiple defects indicate a systematic effort to gain advantage.  *Id.* at 124.  In *Circuit City Stores, Inc.*, the Ninth Circuit followed *Armendariz* and refused to sever "objectionable provisions [that] pervade[d] the entire contract."  *Circuit City Stores, Inc. v. Adams*, 279 F.3d 889.

Here, the arbitration agreement contains numerous objectionable provisions that (i) shorten the statute of limitations to a period that arguably bars Plaintiffs' claims before they even knew the claims existed; (ii) unilaterally allows Citibank to change the terms of the agreement without notice; (iii) prevent Plaintiffs from vindicating their statutory rights; and (iv) imposes

24

arbitration in a forum outside of a customer's hometown area.  Thus the arbitration agreement is permeated by unconscionability, and the entire agreement should be invalidated.[10]

## V.    CONCLUSION

For the foregoing reasons, the court should deny Defendant's Motion to Compel Arbitration.

Dated: April 17, 2012

Respectfully submitted,

By: /s/ James C. Kelly
James C. Kelly (JK-9616)
**THE LAW OFFICE OF JAMES C. KELLY**
477 Madison Avenue, Sixth Floor
New York, New York 10022
Tel: 212-920-5042
Fax: 888-224-2068
Email: jkelly@jckellylaw.com

*Attorney for Plaintiffs*

---

[10] If a court strikes provisions or adds other provisions to an arbitration clause, this is not enforcing an agreement according to its terms, and is inconsistent with the FAA.  Courts should not rewrite arbitration clauses to make them enforceable.  In *Graham Oil Co.*, the Ninth Circuit held, "Our decision to strike the entire clause rests in part upon the fact that the offensive provisions clearly represent an attempt by ARCO to achieve though arbitration what Congress has expressly forbidden…Such a blatant misuse of the arbitration procedure serves to taint the entire clause." *Graham Oil Co. v. ARCO Prods. Co.*, 43 F.3d 1244, 1249 (9th Cir. 1994).[10]  For these reasons, the court should not attempt to re-tool the arbitration clause to eliminate the objectionable aspects, but should instead invalidate the arbitration agreement in its entirety.