**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------- X
:::
BERTRAM HIRSCH and IGOR ROMANOV, on :
behalf of themselves and all others similarly situated, :
                                                            :   Case No. 12 Civ. 1124 (DAB)
                        Plaintiffs,                          :
                                                            :
            vs.                                              :
                                                            :   **NOTICE OF APPEAL**
CITIBANK, N.A.,                                             :
                                                            :
                        Defendant.                          :
-------------------------------------------------------------- X

      **NOTICE IS HEREBY GIVEN** that Citibank, N.A., defendant in the above-named case,

by and through its undersigned attorneys, hereby appeals to the United States Court of Appeals

for the Second Circuit from the Memorandum and Order entered in this action on the 10th day of

June, 2014 (the "June 10, 2014 Order").  A copy of the June 10, 2014 Order is attached at

Exhibit A.

      The other parties to the June 10, 2014 Order and the names and addresses of their

respective attorneys of record are as follows:

      James Clayton Kelly, Esq.
      The Law Office of James C. Kelly
      244 5th Avenue, Suite K-278
      New York, New York 10001
      Tel: 212-920-5042
      Toll Free Tel: 888-643-7517
      Toll Free Fax: 888-224-2078
      jkelly@jckellylaw.com

Samuel P. Sporn, Esq.
Schoengold & Sporn, P.C.
World Wide Plaza
393 West 49th Street
Suite 5HH
New York, NY 10019
Tel: 212-964-0046
sporn@spornlaw.com

*Attorneys for Plaintiffs Bertram Hirsch and Igor Romanov*


Dated:  New York, New York
        July 9, 2014

                              STROOCK & STROOCK & LAVAN LLP

                              By:   /s/ Joseph E. Strauss
                                    Joseph E. Strauss (JES-1788)
                              180 Maiden Lane
                              New York, New York 10038
                              212-806-5400
                              *Attorneys for Defendant Citibank, N.A.*

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
BERTRAM HIRSCH and IGOR ROMANOV, on
behalf of themselves and all others
similarly situated,

               Plaintiffs,

                        12 Civ. 1124 (DAB)
   -v.-                  <u>MEMORANDUM AND ORDER</u>

CITIBANK, N.A.,

               Defendant.
------------------------------------X
DEBORAH A. BATTS, United States District Judge.

    This matter is before the Court pursuant to the November 14,
2013 Mandate issued by the United States Court of Appeals for the
Second Circuit, which vacated the Court's March 28, 2013 Opinion
and remanded the matter for further proceedings. <u>Hirsch v.
Citibank, N.A.</u>, 542 Fed. App'x 35 (2d Cir. 2013).  Having
provided Parties additional opportunity to present factual
evidence on the issues in dispute, the Court finds that
Plaintiffs Bertram Hirsch ("Hirsch") and Igor Romanov ("Romanov")
(collectively "Plaintiffs") did not agree to arbitration.
Therefore, Defendant Citibank N.A.'s ("Citibank" or "Defendant")
Motion to Compel Arbitration is DENIED.


I. BACKGROUND

    The Court's March 28, 2013 Opinion contains a detailed
factual background and analysis of the issues before the Court.

See Romanov v. Citibank, N.A., No. 12 Civ. 1124, 2013 U.S. Dist. LEXIS 48511 (S.D.N.Y. Mar. 28, 2013).  In sum, Plaintiffs opened accounts with Citibank pursuant to a promotion for travel miles, and when a dispute arose about being taxed for those benefits, Plaintiffs denied that they had agreed to arbitration.

On November 14, 2013, the Circuit's Mandate issued in this matter, and the arbitration issue was remanded to this Court.  On November 25, 2013, the Court issued an Order scheduling a hearing on the factual issues raised in the Summary Order and Mandate, and granting Parties time to conduct limited discovery. (ECF No. 33.)  The Court referred the case to Magistrate Judge James L. Cott for interim discovery disputes, (ECF No. 34), and Judge Cott held a hearing on December 20, 2013. (ECF Nos. 35, 37.)  The Court granted Parties a final extension of the discovery schedule, but kept the evidentiary hearing set for January 27, 2014. (ECF No. 36.)  Defendant filed a Pre-Hearing Brief and Supporting Exhibits on January 23, 2014, (ECF No. 39), and Plaintiffs, on January 27, 2014. (ECF No. 40.)  The Court held hearings on January 27, 2014, (see Jan. Hr'g Tr., ECF No. 41), and February 19, 2014. (See Feb. Hr'g Tr., ECF No. 46.)[1]  The

---

[1] Because this Opinion cites transcripts from three separate hearings in this matter, the transcripts from the January 2014 and February 2014 hearings are abbreviated Jan. Hr'g Tr. and Feb. Hr'g Tr., respectively.  The transcript from the December 2013 discovery conference before Judge Cott is abbreviated Dec. Hr'g Tr.

facts below are taken from deposition and hearing testimony of Defendant's current and former employees, as well as Plaintiffs Hirsch and Romanov.

### A. Citibank's Deposition Testimony

#### 1. Nancy Lewis

Nancy Lewis ("Lewis"), currently a senior vice president at Citibank, leads a team responsible for implementing all of Defendant's policies and procedures. (Lewis Dep. 6:8-12.)  Though she works on compliance issues for the bank, Ms. Lewis did not oversee compliance at Citibank's Great Neck branch, where Plaintiff Hirsch opened his accounts. (Lewis Dep. 5:22-24.)  Ms. Lewis was involved in creating Defendant's account opening policies,[2] but she had no part in creating the Client Manual. (Lewis Dep. 9:6-9, 17:3-4.)

To complete an account opening, customers are only required to sign a signature card.[3] (Lewis Dep. 9:25-10:10.)  Personal

---

[2] Later in the deposition, Ms. Lewis contradicts this assertion. (Lewis Dep. 24:1-7) ("Q: Were you involved in creating policies and procedures in opening accounts? A: Not for creating them.  My team is responsible for updating them when we require updates.")

[3] The signature card, in relevant part, reads "By signing below, I (1) certify my tax status, (2) agree to be bound by any agreement governing any account in the title indicated on this card." (Def.'s Br. 2-3; Exs. C, D.) The signature card then clarifies that a customer certifying his/her tax status will list the correct taxpayer identification number, attest to not being subject to backup withholding, and confirm his/her U.S. citizenship or residency status. (Id.)

bankers are expected to provide new savings and checking account customers a Client Manual[4] and, depending on the account, a Marketplace Addendum. (Lewis Dep. 10:11-19.)  Lewis indicates that this procedure is uniform throughout the country, but there are no individual records kept and no means in place to prove that the policy is followed. (Lewis Dep. 10:20-22, 36:16-25.) With regard to proof of Plaintiffs receiving the Client Manual, Ms. Lewis testified as follows:

> Q: Is there any document or other piece of evidence to show that the plaintiffs in this lawsuit Bertram Hirsch or Igor Romanov actually received a client manual at the time they opened up their accounts?
>
> A: The signature card.
>
> Q: How does that show that they received the client manual when they opened up the account?
>
> A: It states on it that the customer is saying that they are going to abide by the terms designated.

(Lewis Dep. 13:7-19.)  Presented with documentary evidence, and upon further questioning, Ms. Lewis offered nothing that connects the signature card to the Client Manual:

> Q: Where do you see that on this document, an indication that the customer received a client manual?
>
> A: 'By signing below I certify my tax status and agree to be bound by any agreement governing any account opened in the title indicated on this card.'

---

[4] Ms. Lewis actually refers to the document as the "Customer Manual." (Lewis Dep. 10:14.)

4

Q: That tells you that the client received a client
manual?

A: Yes.

(Lewis Dep. 14:12-21.)  Ms. Lewis stated that customers receive
the Client Manual and any other documents after signing the
signature card. (Lewis Dep. 24:8-19.)

Ms. Lewis testified that Defendant's policies do not require
employees to review any part of the Client Manual with customers.
(Lewis Dep. 16:10-16.)  Citibank's employee training does not
entail an arbitration component, and no employee has ever asked
Ms. Lewis about arbitration. (Lewis Dep. 16:17-20.)  In fact,
Lewis makes clear that she is not familiar with arbitration at
all. (Lewis Dep. 12:9-11.)

In personal banker training, Citibank employees use the
"Personal Banker Foundations Participant Guide," which contains
the "Customer Care Checklist." (Lewis Dep. 25:3-5, 27:6,12-13;
see id. at 26:17-27:3.)  Also, when opening an account, personal
bankers use the "Customer Care Checklist" as a reminder, and will
print out copies that have the customer's name on them. (Lewis
Dep. 27:13-23.)  Copies of the "Customer Care Checklist" are not
kept in the customer's file and, because Defendant has nothing in
its policies regarding them, Ms. Lewis does not know what happens
to the checklists after an account opening. (Lewis Dep. 28:3-6.)

Citibank also has a document entitled "Our Privacy Notice from [sic] New Customer Citibank," which is contained in the Client Manual,[5] but is also maintained as a separate document. (Lewis Dep. 28:9-10, 29:13-14.)  The separate document is not provided to all customers, but only to those who request a copy of the privacy notice. (Lewis Dep. 28:20-23, 29:13-16.)

### 2. Michael Ashley

Michael Ashley ("Ashley") worked at Citibank's Great Neck branch from 2007 to 2010, but he worked for Defendant for approximately twenty-four years. (Ashley Dep. 12:24-13:6, 15:15-16.)  Though he was responsible for opening Mr. Hirsch's Citibank accounts, he does not remember doing so. (Ashley Dep. 20:8-13, 86:10-20.)  It is Citibank's practice to introduce clients to the manager, however Mr. Ashley cannot recall if he introduced Mr. Hirsch to Mr. Lotto, the Great Neck branch manager at the time. (Ashley Dep. 89:14-24.)

The signature card is the only document signed during the account opening, and it is executed before the customer receives account documents -- the personal disclosure, the Client Manual, starter checks, general literature, and mail offers. (Ashley Dep.

---

[5] Ms. Lewis, again, refers to the document as the "Customer Manual." (Lewis Dep. 28:25.)

42:17-18, 44:18-45:21, 62:10-12.)  Mr. Ashley described how he

explained the significance of the signature card to new

customers:

> Well, after they go through opening the account and
> this prints out, I take the card.  And if you were
> sitting in front of me, I would reiterate, 'This is
> your name.  Is it spelled right?'  The correction.
> Social security number.  Would let them know I'm
> linking whatever accounts are linked, which on that day
> was a checking and savings account.  And I would say to
> Mr. Hirsch, 'If you're in agreement, sign the card.'
> And then also go over what it says in the disclosure.
> Because on the cards, which protects me and the client,
> when I go over everything in the sales conversation and
> they initial, the whole process of leading up to the
> final steps of account opening and going through the
> whole thing, whether it's a campaign -- this card
> that's designed by the bank or to protect the client
> and the bank and myself, 'By signing below, I certify
> my tax status under any penalties and subject to backup
> withholding,' I disclose this section.  And by signing
> that, they're in agreement with that.  If they weren't,
> they wouldn't sign the card.  Or if there's anything
> that they didn't -- weren't sure of, then we would go
> over that.

(Ashley Dep. 36:12-37:23.)  When opening an account, Mr. Ashley

explained to the customer the check writing policies, fees, and

balance requirements. (Ashley Dep. 56:18-22.)  He is adamant that

customers would take the Client Manual[6] upon opening an account,

but says that he would not go through the document with them.

(Ashley Dep. 60:19-61:7, 61:14-15.)  He knows that the Client

Manual contains an arbitration clause, but the transcript makes

---

[6] Mr. Ashley refers to the document as the "Customer Manual." (Ashley Dep. 59:12.)

clear that Mr. Ashley is not familiar with the concept of arbitration. (Ashley Dep. 61:16-62:6, 64:7-22.)[7]  Furthermore, he cannot recall a customer ever asking him about arbitration, and he has never explained it to one. (Ashley Dep. 65:2-9, 66:18-25, 67:22-68:5.)

Mr. Ashley is not familiar with either the "Personal Bankers Foundations Participant Guide, North America Consumer," or the "Customer Care Checklist" contained therein. (Ashley Dep. 73:10-75:6.)

### 3. Vivian Safir

Vivian Safir ("Safir") began working with Citibank in 1985, and has held various positions before her current role -- personal banker. (Safir Dep. 5:4-6, 8:15-17, 9:4-6, 9:25-10:18.) Ms. Safir never received formal training for her roles at Citibank, and she simply watched someone go through the account opening process before doing so alone. (Safir Dep. 12:3-7,17-20, 25:25-26:5.)

Ms. Safir denies the existence of formal documents providing instructions on account openings.  When asked, "[w]as [sic] there any formal documents or sales manual or sales Q & A internal for

---

[7] Mr. Ashley confuses arbitration with deposition, as he states arbitration is "what we're doing here right now." (Ashley Dep. 62:3-4.)

you[,] to instruct you how to open an account?" or if there was
anything documenting "[s]teps to take to open an account," she
replies "No." (Safir Dep. 25:16-24.)  Though she later says that
she is familiar with the "National Forms Center Citibank," which
includes a "Customer Account Opening Stage 1: Introduction," Ms.
Safir says that she does not use either because she has been
opening accounts for so long. (Safir Dep. 32:9-33:2, 34:5-11.)
Nor has she ever seen the "Personal Banker Foundations
Participant Guide North America Consumer," which she states is
only for new hires. (Safir Dep. 35:21-36:6,16-18.)

     Regarding the "Customer Care Checklist," Ms. Safir first
states that she checks off the boxes for each step, but then says
that she does not check off the boxes. (Safir Dep. 39:4-6, 40:6-
18.)  She says that she ultimately gives the checklist to the
client. (Safir Dep. 41:5-6.)  To the extent that Ms. Safir checks
whether she has gone through all of the steps, it does not
necessarily occur while the account is being opened:

     Q: A new client that opens an account has a checklist
     associated with that account; is that correct?

     A: Everything you do, that comes out.  Whether it's
     checking or saving or whatever.  Any time you open any
     account, this pops up.

     Q: It pops up on the screen?

     A: Not the screen, the end of the transactions.  At the
     end of finishing account opening, it comes from the

9

printer.

Q: It prints out?

A: Prints out.

Q: Do you go through the list to make sure that you've done everything, that everything is correct on here?

A: Yeah, I could do it that minute or later, it didn't have to be the same, you know.

Q: So this occurs--

A.  This is just for me.  That checklist is for me.

(Safir Dep. 42:7-19.)  Any remaining printout of the checklist is shredded within two weeks, and Citibank's computer record of the checklists becomes inaccessible shortly after the account has been opened. (Safir Dep. 43:13-14, 44:9-12.)

When opening accounts, Ms. Safir says that she discusses Citibank's policies -- fees, writing checks, fee waivers, overdrafts -- if the customers ask about them. (Safir Dep. 15:22-16:1, 17:16-8,18-24.)  Likewise, she will discuss the account opening documents with customers if they ask, but nobody ever asks questions about them. (Safir Dep. 21:21-22:3,7-10.)  Ms. Safir says that she has never run out of the account opening documents, and that employees will tell "them" if they run out. (Safir Dep. 23:25-24:12.)

Ms. Safir is not familiar with arbitration. (Safir Dep. 45:6-9.)  She neither recalls discussing an arbitration provision

with customers, nor ever being prompted to do so. (Safir. Dep. 51:15-52:6.)  Citibank has never provided employee training regarding how to discuss the arbitration provision, and Defendant has no formal documents requiring employees to tell customers of its existence. (Safir Dep. 54:5-14.)

After a customer signs the signature card, Ms. Safir will provide a "Welcome Kit," which includes, among other documents, a Client Manual. (Safir Dep. 47:21-48:17.)  She does not go through the Client Manual with customers, but will explain anything if they have questions. (Safir Dep. 49:24-50:6.)  People generally do not have questions about the Client Manual. (Safir Dep. 50:13-15.)  Ms. Safir asserts that the front page of the Client Manual indicates that it contains the terms and conditions of the account. (Safir Dep. 62:22-63:9.)[8]


### 4. Fazri Zubair

Fazri Zubair ("Zubair") began working as a personal banker for Citibank in 2009. (Zubair Dep. 8:13-19.)  He was trained for the job through a course called "Personal Bankers Foundations," which taught employees to provide clients with certain documents,

---

[8] In reality, it is not until page 5 that the Client Manual at issue says it governs the terms and conditions, along with other documents. (Def.'s Br. 3; Ex. F.)  Arbitration is mentioned on page 8 of the 47 paged document. (Id.)

including the Client Manual and a Marketplace Addendum. (Zubair Dep. 10:5-11, 11:3-5,17-22.)  He does not recall meeting Mr. Romanov. (Zubair Dep. 11:14-16.)

Unlike the other personal bankers, when opening a customer account, Mr. Zubair would give the customer the "Welcome Kit," including the Client Manual, before having the customer sign the signature card. (Zubair Dep. 13:8-12, 14:2-10.)  When asked to "go through the process when [he] open[s] up an account, a new checking or savings account, the exact steps . . . [f]rom when [he] sit[s] down with the client," (Zubair Dep. 12:10-14), Mr. Zubair indicated that the

> [c]lient comes in, we sit down.  We identify what
> solution they need.  At that point we verify who they
> are.  If they're an existing client, we use one of the
> existing forms of identity checking that we have
> available, pin number, I.D. card.  If they're a new
> client, two forms of I.D. or a form of I.D., depending,
> and then we go into a new account opening procedure, we
> input the information into the computer.  At that
> point, we confirm the information with the client, we
> print out the documentation, we have welcome kits that
> we pre make for ourselves.  These welcome kits are a
> folder.  They have marketing material, client manual,
> marketplace addendum, any printouts that we might need.
> At the point of new account opening, we double-check
> the National Forms Center because a lot of times new
> disclosures might come up during the week and we try to
> pre make the kits at the beginning of the week to save
> us time during the process.  If there is anything new,
> print them out, add it to the folder, we hand it to the
> client.  They review the documents.  At that point we
> bring out the signature card, we have them sign the
> signature card, they're confirming that they received
> the kit from us, they're acknowledging that they're

opening the account, and I think there's some other
stuff on there they're acknowledging, since I don't
remember because it's been a while.  Take the card back
and the client has the new account."

(Zubair Dep. 12:10-13:18.)  He would list the documents in the
"Welcome Kit," but would not go over important provisions unless
specifically asked. (Zubair Dep. 14:17-25.)  He cannot recall a
time where account opening documents were not available for
customers. (Zubair Dep. 17:9-14.)

Mr. Zubair does not understand the definition of
arbitration, but was aware of the arbitration clause in the
Client Manual. (Zubair Dep. 15:10-13.)  He would not explain the
arbitration provision unless a customer asked about it, which
happened in only one instance. (Zubair Dep. 15:14-19.)  That
time, a customer asked if he could cross out the arbitration
provision, and Mr. Zubair, who thought it was a funny request,
answered in the negative. (Zubair Dep. 15:21-22, 16:2.)

Mr. Zubair would spend between one hour and a half a day
with a client when opening an account, (Zubair Dep. 25:23-26:1),
but he suggested that he did not introduce clients to the branch
manager consistently.  When asked "[a]t the end of the client
account opening process, did you ever introduce the customer to
the branch manager?" Mr. Zubair answered "Yes." (Zubair Dep.
28:3-6.)  However, when asked if he did "that at every account

opening process that [he] went through?" he responded, "[a]ny account opening process where they were available." (Zubair Dep. 28:7-10.)

Mr. Zubair would use the "National Forms Center" account openings section as a visual checklist for the account opening steps. (Zubair Dep. 28:15-29:3.)  He was familiar with the "Customer Care Checklist," and would provide the printed version to customers. (Zubair Dep. 30:18-31:11.)  Mr. Zubair could not name a document, other than the signature card, that is used to indicate that a client received the Client Manual. (Zubair Dep. 31:20-25.)

### B. Plaintiffs' Deposition Testimony

#### 1. Bertram Hirsch

Plaintiff Hirsch is a semi-retired attorney. (Hirsch Dep. 23:1-10.)  His practice has not involved contract law or claims against banks and credit card companies. (Hirsch Dep. 16:8-12, 17:12-15.)  He maintains two homes, including one in Floral Park, New York, which is primarily used as a place of work and for storing records. (Hirsch Dep. 24:11-15, 26:19-20.)  Mr. Hirsch has bank accounts with institutions other than Citibank and, despite the fact that he cannot recall having received or reviewed agreements for most of them, he assumes that the

14

accounts are governed by some type of agreement. (Hirsch Dep. 29:16-23, 31:8-25, 33:21-34:10.)

Mr. Hirsch recalls opening a savings account and a checking account with Citibank on October 25, 2010 in a "very routine and very fast" process, which took about 20-25 minutes. (Hirsch Dep. 50:11-15; see id. at 48:4-49:14.)  After reading the signature card, Mr. Hirsch signed it, which ended the account opening session. (Hirsch Dep. 52:12-16.)  Before leaving the branch, he did not receive a Client Manual or a folder containing documents, but only a few loose pieces of paper, including a "Citi Products Opened/Applied For Today" (verifying his deposit), Citibank's Privacy Notice, and fliers for two products that he turned down. (Hirsch Dep. 55:11-59:11, 70:19.)  Mr. Hirsch reviewed only the "Citi Products Opened/Applied For Today" document, which took about one minute, because it was the "critical document" that confirmed his deposits. (Hirsch Dep. 57:15-58:9, 64:18-65:1.)  He kept the documents with other banking records in his Floral Park home. (Hirsch Dep. 59:12-60:13.)  Mr. Hirsch states he was unaware of the Client Manual prior to the instant case, and he never inquired about the terms and conditions of the accounts. (Hirsch Dep. 72:13-17, 83:19-21.)

### 2. Igor Romanov

In October 2010, Fazri Zubair opened a savings account and a checking account for Mr. Romanov in Citibank's Marina Del Rey, California branch. (Romanov Dep. 9:5-12, 27:3-17.)  When he signed up for the account, Mr. Romanov wrote checks, signed a signature card, and was given a deposit slip indicating the transaction had occurred. (Romanov Dep. 11:17-12:18.)  He was told that he would receive other documents in the mail. (Romanov Dep. 12:19, 13:11-12.)  Mr. Romanov states he first saw the "Customer Care Checklist" at his deposition; it was neither discussed with him nor provided to him at the account opening session. (Romanov Dep. 15:7-16.)  Mr. Zubair explained the account fees to Mr. Romanov, as well as how to use the ATM card and how often he should use it. (Romanov Dep. 15:17-21, 35:2-8.)  Mr. Zubair did not explain to Mr. Romanov that he was entering into an arbitration agreement with Citibank, and he did not introduce Mr. Romanov to the branch manager. (Romanov Dep. 16:3-14.)

Mr. Romanov estimates that opening the account took between 15-20 minutes. (Romanov Dep. 34:14-16.)  Other than asking if there were limitations on withdrawing funds and what interest would accrue on the funds, Mr. Romanov only asked questions that related to the miles award program. (Romanov Dep. 35:2-22.)  He

16

then wrote two checks and signed a signature card to open the accounts. (Romanov Dep. 36:2-6, 37:12-14,17-18, 38:4-6.)   Mr. Romanov did not ask about the signature card or an agreement before or after signing. (Romanov Dep. 38:23-39:5.)

Mr. Romanov states he received a receipt for opening the account but did not receive a folder or any other documents. (Romanov Dep. 40:22-41:13.)   Even after receiving monthly account statements in the mail, Romanov never requested a copy of the Client Manual, Marketplace Addendum, or other account documents. (Romanov Dep. 45:22-24, 46:14-22.)   Mr. Romanov keeps his files in a locked room in the building where he lives, and while whomever he lives with could access his files, he has no reason to believe that anyone has gone through or taken his papers. (Romanov Dep. 53:3-56:6.)   During the course of discovery, Mr. Romanov produced only some of documents requested, but not all; he maintained that he possessed no documents relating to the opening of the accounts in October 2010. (Romanov Dep. 58:3-60:4.)   Citibank ostensibly possesses copies of the requested documents. (Romanov Dep. 60:5-6.)

C. Hearing Testimony

1. George Lotto

Since 2005, George Lotto has been the manager of Citibank's

17

Great Neck branch. (Jan. Hr'g Tr. 43:16-17.)  He is responsible for ensuring that employees follow policies and procedures, but he does not personally open customer accounts. (<u>Id.</u> at 43:24-44:5.)  Mr. Lotto indicates that Citibank has uniform policies and procedures related to account openings for new customers, and that the Great Neck branch follows the policies and procedures. (<u>Id.</u> at 46:21-47:1.)  Part of the policy, which he maintains was in place in October 2010, is to provide new clients with certain documents -- a confirmation page, a Client Manual, addenda, and disclosures -- and to place them into a folder for the customer. (<u>Id.</u> at 47:20-48:18, 50:11-15, 51:9-12.)  Personal bankers are instructed to explain that the Client Manual contains information about the account, and to discuss provisions of the document if requested by the customer. (<u>Id.</u> at 48:19-49:1.)

Customers are required to execute a signature card, and employees must describe the card's identity function -- to verify customers' signatures and tax identification numbers. (<u>Id.</u> at 51:15-52:6, 56:13-57:3.)  Specifically, employees will

> say . . . there are two cards here, so they tell the client, one card stays in the branch, the other card goes to the clearinghouse.  And this is used to identify the client when they are writing a check or making a withdrawal, whether at the branch or, or outside.  You know, when it goes to the clearinghouse.  And it also, it's -- they do mention that by signing they are certifying that -- their tax ID number.

(Jan. Hr'g Tr. 51:21-52:3.)  Mr. Lotto declares that a customer would receive a Client Manual and other documents after signing the signature card. (Id. at 52:16-53:9, 53:25-54:8.)  However, he is unable to say whether employees explain a connection between the signature card and an agreement or the Client Manual:

> The Court: All right.  And would you say, when you say it's discussed first, what do you mean that the signature card is discussed first?
>
> Witness: Well, the personal banker says what it is.
>
> The Court: That's the signature card.
>
> Witness: That's the signature card and why they're signing it, yes.
>
> The Court: OK.  And all right.  And what do they say when they tell them that?
>
> Witness:  What I mentioned before.  By signing the card -- there's two cards.  That's one thing.  Because clients will ask, why are there two cards. One goes to the clearinghouse.  One stays in the branch to verify the signature.  And also they mention that they're certifying to a tax ID number.
>
> The Court: Do they say anything about the agreement to all of the --
>
> Witness: I think it varies between the -- I think it varies, it may vary.
>
> The Court: OK.  So that --
>
> Witness: By the banker.
>
> The Court: So that number 2 or, I'm sorry, looking at the signature card, at the top it says, 'by signing below, (1) confirm my tax status, (2) agree to be bound by any agreement to open any account opened in the title indicated on this card.'  That point 2 is not necessarily part of the practice of discussing it with the client.
>
> Witness: I think, I think it -- I think it, it varies. They do hand the -- they do talk about the client manual

19

> when they sign the card.
>
> The Court: OK.  But --
>
> Witness:  I don't know if they -- I don't know if they
> specifically mention that, in the card.
>
> The Court: OK.
>
> Witness: I can't say that they do consistently.

(Jan. Hr'g Tr. 56:13-57:23.)  Mr. Lotto further testified that personal bankers will indicate that the Client Manual provides information about fees, transaction limits, and any other questions that a customer may have. (Id. at 59:2-7.)  He cannot recall a time when the branch ran out of Client Manuals. (Id. at 61:7-9.)

Mr. Lotto holds "afternoon wrap-ups," where he sits with bankers, discusses new accounts, and talks about what they can do to meet client expectations. (Id. at 61:13-22.)  During the wrap up, he will refer to a checklist and will ask whether personal bankers have provided copies of the Client Manual and addendum. (Id. at 61:16-62:2.)  He was conducting wrap-ups in October 2010. (Id. at 62:5-7.)  Personal bankers are not required to check the boxes on the "Customer Care Checklist" that prints out at the end of an account opening session, but they may use it as a reference. (Id. at 62:8-9,23-25, 65:22-24.)  Mr. Lotto has not had the experience of a personal banker admitting to forgetting to provide a Client Manual to a customer, nor of a customer complaining about not receiving a Client Manual. (Id. at 63:9-13,22-25, 82:20-83:1.)  Other than his wrap-up sessions, however, Mr. Lotto has no way to confirm whether personal bankers comply with account opening

policies; there is no written documentation of compliance, and Citibank does not require a signature to indicate receipt of the Client Manual, Marketplace Addendum, or an agreement. (<u>Id.</u> at 76:16-77:4, 78:8-16, 79:11-80:11.)

Citibank's employees have access to a "National Forms Center," which houses, among other pages, a "Consumer Accounts Opening, Stage 1, Introduction." (<u>Id.</u> at 66:19-67:13.)  The "Consumer Accounts Opening, Stage 1, Introduction" is a reference page, which shows bankers how to open accounts. (<u>Id.</u> at 67:3-9.)  The page lists steps that Mr. Lotto says reflects policies that were in place at Citibank in October 2010. (<u>Id.</u> at 67:16-68:23.)

Mr. Lotto has never met Mr. Hirsch. (<u>Id.</u> at 69:12-14.)  He has never read the Client Manual, but is aware of the arbitration clause contained therein. (<u>Id.</u> at 83:13-19.)  He acknowledges that he is not competent to discuss the arbitration provision with employees or clients. (<u>Id.</u> at 75:17-76:4, 84:11-15.)

### 2. Bertram Hirsch

On October 25, 2010, Mr. Hirsch met with Mr. Ashley in Defendant's Great Neck branch, and opened a savings account and a checking account. (<u>Id.</u> at 93:2,7-8,15-17.)  Mr. Hirsch wrote a check in the amount of $25,000.00 to be deposited so that he would earn the airline miles associated with a promotional offer that Citibank was sponsoring. (<u>Id.</u> at 93:19-23.)  He did not receive a Client Manual, Marketplace Addendum, or a "Welcome Kit" during the account opening. (<u>Id.</u> at 94:6-18.)  He received a document

confirming the deposit of $25,000.00 into his new account, a Privacy Notice, and fliers for a Home Equity Loan and another product that he declined. (<u>Id.</u> at 95:1-19.)  Mr. Ashley did not take him to meet Mr. Lotto. (<u>Id.</u> at 96:19-23.)

Mr. Hirsch testified that, upon opening the bank accounts with Citibank, he asked Mr. Ashley if the promotional offer had tax implications, and Mr. Ashley told him that there were none. (<u>Id.</u> at 97:9-15.)  After Mr. Hirsch received the 1099 tax form in January 2012, he went into Citibank's Great Neck branch on multiple occasions to complain about the misinformation. (<u>Id.</u> at 97:4-6, 97:17-98:7.)

Mr. Hirsch assumes that Citibank accounts are governed by some agreement, but has stated no assumptions regarding Defendant's airline miles promotional offer. (<u>Id.</u> at 100:23-101:10.)  He reasserted that he signed a signature card and was given four documents to take home with him, including the document titled "Citibank Products Opened/Applied for Today" and the Privacy Notice. (<u>Id.</u> at 102:18-103:2,6-12,20-22.)  At that time, Mr. Hirsch glanced at the Privacy Notice, but did not read it in its entirety. (<u>Id.</u> at 104:1-3.)  In addition, he read approximately two-thirds of the "Citibank Products Opened/Applied for Today" document, up to where it showed the amount that he deposited. (<u>Id.</u> at 115:22-116:12.)  The very end of that document contains the following footnoted statement: "As noted in your client manual, all deposits must be verified by bank personnel and will appear on your credit statement." (<u>Id.</u> at 117:6-8, 118:2.)  Mr. Hirsch did not receive an

agreement governing the account, nor did he ask anyone for a copy
of one, despite the statement on the signature card stating "by
signing below, I (1) certify my tax status, (2) agree to be bound
by any agreement governing any account opened in the title
indicated on this card." (Id. at 105:23-106:4, 113:10-20, 114:7-9.)
Mr. Hirsch received a monthly account statement, and he looked at
the transactions listed on the document. (Id. at 118:12-17, 119:24-
120-2.)  Though the statement stated "Please refer to your Citibank
account terms and details, and conditions for details on how we
determine your monthly fees and charges," he never requested them
because his account did not carry fees or charges. (Id. at 120:6-
16.)

     Mr. Hirsch explained that he keeps the vast bulk of his
documents in his Floral Park home, including all banking records.
(Id. at 105:15-106:6.)  He tends to keep documents, while his wife
tends to dispose of documents. (Id. at 106:7-12.)  He has had a
number of bank accounts in his life, but has not had to refer to
the accounts' terms outside of discrete issues that arose. (Id. at
109:10-110:4,14-22.)  Mr. Hirsch stated that, upon opening accounts
with other institutions, he did not receive anything akin to a
Client Manual. (Id. at 113:3-9.)


II. DISCUSSION
     A. Agreements to Arbitrate and Contract Formation
     An arbitration agreement "shall be valid, irrevocable,

23

enforceable, save upon such grounds as exist at law or equity for the revocation of any contract." 9 U.S.C. § 2.  Pursuant to the Federal Arbitration Act, "prior to compelling arbitration, the district court must first determine . . . [whether] the parties enter[ed] into a contractually valid arbitration agreement." Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel, 346 F.3d 360, 365 (2d Cir. 2003). See 9 U.S.C. § 2.  "When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995). See Perry v. Thomas, 482 U.S. 483, 492 n.9 (1987)("A court may not, then, in assessing the rights of litigants to enforce an arbitration agreement, construe that agreement in a manner different from that in which it otherwise construes nonarbitration agreements under state law."). And while "[t]he Act places arbitration agreements 'upon the same footing as other contracts,'" Schnabel v. Trilegiant Corp., 697 F.3d 110, 118 (2d Cir. 2012)(quoting Scherk v. Alberto-Culver Co., 417 U.S. 506, 511 (1974)), "it 'does not require parties to arbitrate when they have not agreed to do so.'" Id. (quoting Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ., 489 U.S. 468, 478 (1989)).

Parties are in agreement that the laws of New York apply in Plaintiff Hirsch's case, and the laws of California, in Mr. Romanov's case. (Feb. Hr'g Tr. 3:22-4:1.)  "To establish the existence of an enforceable agreement [in New York], a plaintiff

must establish an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound.  That meeting of the minds must include agreement on all essential terms." <u>Kowalchuk v. Stroup</u>, 61 A.D.3d 118, 121 (1st Dep't 2009)(citing 22 NY Jur 2d, Contracts §§ 9, 31).  "Under California law, in order to form a valid and enforceable contract, it is essential that there be: (1) parties capable of contracting; (2) their consent; (3) a lawful object; and, (4) a sufficient consideration." <u>Netbula, LLC v. Bindview Dev. Corp.</u>, 516 F. Supp. 2d 1137, 1155 (N.D. Cal. 2007)(citing Cal. Civ. Code § 1550).  The consent element "requires that the parties' reach mutual assent or consent on definite or complete terms." <u>Id.</u> (citing <u>Merced Cnty. Sheriff's Emps.' Ass'n v. Merced Cnty.</u>, 188 Cal. App. 3d 662, 670 (Cal. Ct. App. 1987)).

B. Receipt of Terms and Sufficiency of Notice

The Circuit found that this Court "erred in concluding that the Signature Cards did not sufficiently incorporate by reference the Client Manual without deciding whether Citibank provided Hirsh and Romanov with the Client Manuals when they opened their accounts." <u>Hirsch</u>, 542 Fed. App'x at 36.  Parties dispute whether Plaintiffs were provided agreements upon opening their bank accounts.  Plaintiffs flatly deny having ever received the Client Manual, (Hirsch Dep. 72:1-5; Romanov Dep. 15:13-16), and Defendant's employees have no personal recollection of distributing the Client Manual to Plaintiffs. (Ashley Dep. 86:10-20; <u>see</u> Zubair Dep. 11:14-16.)  However, Citibank argues that it has a policy and

25

practice that requires its employees to give out the Client Manual, which was followed consistently. (See, e.g., Lewis Dep. 10:11-22; 36:10-17.)[9]  While Citibank's employees agree with the assertion, (Ashley Dep. 63:25-64:3; Safir Dep. 22:11-17; Zubair Dep. 12:17-13), all but one admit that they would provide the Client Manual to customers only after having them execute the signature card. (Lewis Dep. 24:16; Ashley Dep. 44:21-45:5; Safir Dep. 47:25-48:17; Zubair Dep. 13:8-12, 14:2-10; Jan. Hr'g Tr. 52:21-54:8.)[10]  For the reasons stated below, the Court concludes that there is no basis to find that Plaintiffs were provided the Client Manual or given notice of the agreement contained therein.

### 1. Actual Receipt of Terms

Defendant argues that "the signature cards signed by Plaintiffs further satisfy Citibank's burden of proving that Plaintiffs 'actually' received the Client Manual." (Def.'s Br. at 16.)  The Court finds neither the signature card nor anything else in the record establishes that the Client Manual was actually provided to Plaintiffs.

Unlike signature cards in similar cases, the card at issue does not indicate that Plaintiffs received the Client Manual.  In Samuel L. Hagan II, P.C. v. J.P. Morgan Chase Bank, N.A., 33 Misc.

---

[9] As noted earlier, Ms. Lewis, on more than one occasion, refers to the document as a "Customer Manual." (Lewis Dep. 10:14, 28:25.)

[10] That Defendant's employees provide the Client Manual to customers after the customers execute the signature card weakens Citibank's argument that Plaintiffs were on inquiry notice of the arbitration agreement. See Section II.B.3 infra.

3d 1211(A), 1211A (N.Y. Sup. Ct. 2011), the Court found that the signed signature card resolved a similar dispute, establishing conclusively that Plaintiff received the terms and conditions governing his account.  There, however, the signature card's language explicitly stated that the Plaintiff had "received and agree[d] to the Terms and Conditions for Business Account and the Business Banking Card Agreement." Id.  Accordingly, the Court concluded that the plaintiff was "estopped from now claiming non-receipt of the Account Agreement." Id.

Citibank argues that "Plaintiffs could not have signed the signature cards without also receiving the Client Manual at the time they opened their Accounts." (Def.'s Br. at 16.)  In support of this contention, Citibank points to the signature card itself, but also highlights testimony from its employees.  The signature card, however, does not establish receipt of the Client Manual, as the card makes no mention of the document. (See Def.'s Br. at 16; Ex. C at CITI-0000080, Ex. D at CITI-0000078.)  The card, instead, merely establishes matters related to Plaintiffs' tax statuses and that Plaintiffs are bound by "any" un-referenced agreement. (Id.; see supra § I.A.1 n.3)

Furthermore, notwithstanding the extensive deposition testimony in the record, not a single employee utterance provides a connection between the signature card and the Client Manual sufficient to demonstrate actual receipt. (See Def.'s Br. at 16-20.)  Though Nancy Lewis says the signature card itself indicates that the signer received a Client Manual, her basis for asserting

27

as much is unclear; as noted at footnote 3, the signature card states nothing to the effect that customers sign it only upon receiving the Client Manual. (Lewis Dep. 13:7-19, 14:12-21.)  Mr. Zubair, the only employee who says that the signature card is signed after the "Welcome Kit" is given to the client, made a similar claim, but also provided no basis for it. (Zubair Dep. 13:11-18.)  Nor does Mr. Ashley's deposition testimony show a connection between the signature card and the Client Manual.  When asked, "What do you tell the customer [the signature card] is?," Mr. Ashley never mentions the Client Manual. (Ashley Dep. 36:6-37:23.)  Indeed, when asked whether customers signed to acknowledge receipt of the Client Manual, one employee stated plainly "[n]obody ever signs for that," (Sarraf Dep. 27:18), and another explained that the signature card "would be the only document that's signed at the end of the sales." (Ashley Dep. 42:17-18.)  Neither the signature card itself, nor the testimony of employees, supports a finding of actual receipt.

### 2. Presumption of Receipt

In this Circuit, "a presumption of receipt arises where . . . the record establishes office procedures, followed in the regular course of business, pursuant to which notices have been addressed and mailed." Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 597 F.3d 84, 92 (2d Cir. 2010).[11]  Citibank argues that it is due the

---

[11] Case law discussing the presumption of receipt has been limited to policies and procedures regarding mailed documents, not those alleged to have been given in face-to-face interactions like the issue before the Court.

presumption of having established a policy, as well as having provided customers the Client Manual upon opening accounts.  In support of this position, Citibank puts forward deposition testimony of various employees and former employees, as well as pages of an internal documents ostensibly provided to personal bankers.

As proof of its current policy, Defendant first offers the deposition testimony of Nancy Lewis.  Lewis is a senior vice president at Citibank, who works with a support team responsible for a "number of different administrative functions including creating and implementing all policies and procedures." (Lewis Dep. 6:8-12.)[12]  Lewis declared that she was personally involved with creating the policies for opening accounts. (Lewis Dep. 6:8-12, 9:6-9.)  She also declared that Citibank policy requires bankers to provide disclosures, including "a customer manual" and the "marketplace [addendum]," when opening an account. (Lewis Dep. 10:11-22.)

In addition, Citibank offers two documents as further evidence of its policy to provide Client Manuals to customers.  Citibank's "Personal Bankers Foundation" manual, on page 7, instructs Defendant's employees to "[c]onsolidate relevant documents (i.e. Client Manual and Disclosure) and provide them in the Welcome

_____

Because mailing procedures provide no precise corollary, Ma and related cases provide guidance but cannot be deemed dispositive.  The question of receipt of the Client Manual, therefore, is limited to the case at bar.

[12] But see footnote 2 supra.  Ms. Lewis stated that her team was not responsible for creating the policies, only updating them.

Folder" that is ostensibly given to customers. (Def.'s Br. at 10;
Ex. I at CITI-0000121.)  Similarly, the "Customer Care Checklist,"
which is contained in the same manual, has a checkbox next to the
"Client Manual and Marketplace Addendum – Explained & given to
Client" step. (Def.'s Br. at 10; Ex. I at CITI-0000123.)  Standing
alone, Citibank's evidence would make it more likely than not that
there was an established policy, as its documents seem to mandate
an "office practice . . . geared . . . to ensure the likelihood"
that customers would receive essential documents. <u>Nassau Ins. Co.
v. Murray</u>, 46 N.Y.2d 828, 830 (N.Y. 1978).[13]

Still, the instant matter presents facts that are materially
different from those set out in <u>Ma</u>, and cast doubt on whether
Defendant is entitled to the presumption of notice.  In <u>Ma</u>, for
example, "[t]he parties d[id] not dispute that Merrill Lynch
generated the[ ] statements in the ordinary course of business,
that Merrill Lynch mailed them to Ma at the address he provided,
and that Ma received at least some of them." <u>Ma</u>, 597 F.3d at 87.
Also in <u>Ma</u>, the Court had the benefit of a "record indicat[ing]
that the account statements were mailed from a central Merrill
Lynch facility in Piscataway, New Jersey, over which account
representatives, such as [the individually named defendant], had no
control." <u>Id.</u> at 92-93.  Finally, in that case, "the section

_____

[13] As noted in footnote 11 <u>supra</u>, the case does not definitively address
this part of the receipt issue before the Court.  In <u>Nassau Ins. Co.</u>, as in
<u>Ma</u>, the Court is presented with a transaction by mailing, not in person.
<u>Nassau Ins. Co.</u>, 46 N.Y.2d at 830 (Before the Court will find that there is a
policy, a party must establish "the likelihood that a notice . . . is always
properly addressed and mailed.").

manager of statements who oversaw the production, addressing, and mailing of monthly statements . . . during the period at issue," attested that "no statements sent to plaintiffs were returned" as undeliverable. Covina 2000 Ventures Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., No. 06 Civ. 15497, 2008 U.S. Dist. LEXIS 32799, * 12-13 (S.D.N.Y. Apr. 21, 2008).  The combination of the plaintiff's admitted receipt of some statements, the mailings being conducted by another party in a separate facility, and the testimony that the plaintiff's mail was not returned undelivered, was sufficient to validate the mailing of "account statements that . . ., for whatever reason, [Plaintiff] chose to ignore." Ma, 597 F.3d at 93.

    Here, however, Plaintiffs deny having ever received copies of the Client Manual. (Hirsch Dep. 72:1-5; Romanov Dep. 15:13-16.) Also, Defendant neither claims to have an independent system for processing documents, nor a separate facility from which they are mailed to clients.  Instead, the "Welcome Kits" are compiled by hand by the personal bankers, (see, e.g. Safir Dep. 22:18-25), the very employees who do not have personal recollection but claim to have always provided all of the account opening documents. (Safir Dep. 20:15-17, 21:17-21; Ashley Dep. 86:22-25.)  Nor are the manager's routine "afternoon wrap-ups" sufficient to establish that the personal bankers have always provided customers with the Client Manuals.[14]  Moreover, Mr. Lotto admits that Citibank maintains "no .

_____

    [14] The Court also notes that George Lotto, who was the manager of Citibank's Great Neck branch when Mr. Hirsch opened his accounts, gave conflicting testimony on this issue.  He first testified that bankers are not

. . writing, receipt, [or] acknowledgment of a so-called agreement
to arbitrate" being provided to customers. (Jan. Hr'g Tr. 78:8-15.)
In fact, the only evidence of Defendant's employees distributing
the Client Manual that might be considered either objective or
contemporaneous,[15] the "Customer Care Checklist," is unknown to some
employees, unused by others, and disposed of in some manner by
most. (See Section I.A.1-4 supra; Lewis Dep. 28:3-6; Ashley Dep.
73:10-75:6; Safir Dep. 41:5-6, 43:13-14, 44:9-12; Zubair Dep.
30:18-31:11.)  Devoid of any independent evidence on this issue,
Citibank falls short of the standard required for a presumption of
notice.

   "Denial of receipt by the [client], standing alone, is
insufficient to" challenge the existence of the corporate policy
and the presumption of receipt. Nassau Ins. Co., 46 N.Y.2d at
829-30.  However, "a claim of no receipt," id. at 830, coupled with
evidence tending to "show[ ] that routine office practice was not
followed or was so careless that it would be unreasonable to assume
that the notice was mailed," will negate any such presumption. Ma,
597 F.3d at 92 (quoting Nassau Ins. Co., 46 N.Y.2d at 830).  The
testimony and documentary evidence cited below make clear that

---

asked individually about accounts, but as a group. (Jan. Hr'g Tr. 87:3-10)("I
don't do one-on-ones. I have them as a group.")  Shortly after that, however,
Mr. Lotto testified that he conducts his wrap-ups on a one-on-one basis. (Jan.
Hr'g Tr. 88:19-22)("Q: Did you ask Mr. Ashley, on a one-to-one basis, did you
give a welcome kit to Mr. Hirsch that contains a client manual and a
marketplace addendum? What is your answer? A: The answer would be yes.")

[15] But see supra Section I.A.3; Safir Dep. 42:7-19.  Ms. Safir says that
she does not necessarily go through the checklist at the time of an account
opening.

Citibank's employees did not consistently follow account opening policies, and sometimes the prescribed steps were not followed at all.  Therefore, even if Defendant presented enough evidence to show a corporate policy, Citibank would still fail on this question.

Despite the clear expectation to do so pursuant to the "Consumer Account Opening Stage 1," which includes the "procedures for opening a consumer account," (Lewis Dep. 23:24-25; see Zubair Dep. 28:22-25), Defendant's employees acknowledge that they did not review the terms of the account when they were being opened. (Pls.' Br. at 14-15; Ex. D at CITI-00000135; see Safir Dep. 22:2-10; Zubair Dep. 13:20-14:1; Lewis Dep. 16:10-16.)  The document tells personal bankers to "[c]omplete the steps below for each signer," and Step 3 of the opening process directs them to "[a]ccurately and clearly state all material information, terms, conditions, risks and costs to the customer." (Pls.' Br. at 13-14; Ex. D at CITI-00000135.)  For example, despite spending between an hour and a half a day on an account opening, Mr. Zubair describes his account opening process without reference to the information that was required to be disclosed. (Zubair Dep. 12:10-13:18, 25:23-26:1.)  Moreover, Defendant's employees repeatedly stated that they would only discuss specific terms if prompted by clients. (Ashley Dep.60:12-15; Safir Dep. 21:21-22:10; Zubair Dep. 14:22-25.)  Further, Citibank's employees only told clients about bank fees, balance requirements, and the number of checks available, but never disclosed the arbitration clause. (Ashley Dep. 56:14-24, 65:3-9;

Safir Dep. 20:5-22, 44:21-45:11; Zubair Dep. 14:22-25, 15:10-16.)
In fact, not a single Citibank employee who was deposed understood
the basic meaning of "arbitration."[16] (Lewis Dep. 12:9-11; Ashley
Dep. 61:20-62:6; Safir Dep. 45:6-11; Zubair Dep. 15:1-9.)

     Citibank also argues that the "Consumer End-to-End Sales
Process" document demonstrates proof of its policy, and that under
the "Setting Expectations" headline, personal bankers are
instructed to "[c]onsolidate relevant documents (i.e. Client Manual
and Disclosures) and provide them in the Welcome Folder." (Def.'s
Br. at 10; Ex. I at CITI-0000121.)  The very same document,
however, sets out other "steps" in the account opening procedure
that were routinely ignored.[17]  The first step under "Setting
Expectations," for example, directs personal bankers to "Review
Client Care Checklist." (Def.'s Br. at 10; Ex. I at CITI-0000121,
CITI-0000131.)  Nancy Lewis established that the checklists are not
"something all personal bankers must use when opening an account,"
nor are they kept, as there is "nothing in our procedures that
talks about this." (Lewis Dep. 27:4-28:7.)  Michael Ashley not only
stated that he had never seen a customer checklist and, indeed,

---

[16] Arbitration is not part of Citibank employee trainings. (Lewis Dep.
16:17.)

[17] The Court also considers contemporaneous proof of the corporate
policy being followed, which is lacking here. See Bronia, Inc. v. Ho, 873 F.
Supp. 854, 859 (S.D.N.Y. 1995)("the person responsible for actually mailing
these letters, testified that she properly sent them to Tradefield and her
testimony is corroborated by the Federal Express receipts and the fact that
the USDA received the same notice mailings around the same time.")(emphasis
added).  Citibank's employees admitted that they do not have to go through the
steps of the policy while opening the account, and that customer checklists
are destroyed after the account is opened. (See supra Section I.A.3; Safir
Dep. 42:7-19, 43:11-14.)

lacked knowledge of it, he also indicated that he did not recognize the "Personal Banker Foundations" document in which the checklist was found. (Ashley Dep. 73:9-75:6.)[18]

Finally, under the "Setting Expectations" headline, the document directs the personal banker to "[i]ntroduce the client to the Branch Manager," but that, too, was routinely ignored.[19] (Def.'s Br.; Ex. I at CITI-0000121, CITI-0000131.)  Mr. Ashley indicated that while the "practice is to introduce" the client to the manager, the customer "could have said 'I don't have time.  I have to go,'" because "that does happen." (Ashley Dep. 89:21-24.)  Mr. Ashley further stated that he "would bring the client over[, b]ut nine [times] out of ten," the response given was "'I have no time. I gotta go.'" (Ashley Dep. 90:3-4.)  Mr. Zubair also implied that managers were not always available to meet clients in accordance with the policy. (See supra Section I.A.4; Zubair Dep. 28:3-10.) Where, as here, Defendant attempts to establish that a policy was consistently followed, but parts of the policy were demonstrably ignored, there can be no presumption that the policy was followed in the general course of business. See Nassau Ins. Co. v. Murray,

---

[18] Mr. Ashley's denial of ever having seen the "Personal Bankers Foundation" manual, including the checklist contained therein, is notable. Not only does it weaken Citibank's case for a policy mandating that employees provide Client Manuals and other documents to its clients, but it also highlights the discrepancy in the branch manager's testimony.  Mr. Lotto testified to having gone over these very checklists with his employees routinely, which would ostensibly include his "wrap-up" conversation with Mr. Ashley. (Jan. Hr'g Tr. 61:10-62:25; 87:25-88:4; 88:17-89:2.)

[19] Mr. George Lotto testified that while introducing the client to the manager appeared on the same checklist as providing the Client Manual and disclosures, the former step is not considered policy, but just a practice. (Jan. Hr'g Tr. 69:15-21.)

46 N.Y.2d at 830.

If Citibank had a corporate policy regarding account openings, the record makes clear that its employees consistently ignored parts of the policy.  Evidence of "actual mailing must be established before the presumption of receipt arises." <u>Capra v. Lumbermens Mut. Casualty Co.</u>, 43 A.D.2d 986, 986-87 (N.Y. App. Div. 3d Dep't 1974).  While there are no mailings at issues here, there also is no evidence in the file documenting receipt of the Client Manual.  Thus, the Court cannot afford Citibank that presumption. <u>See</u> <u>Coach, Inc. v. Horizon Trading USA Inc.</u>, 908 F. Supp. 2d 426, 432 (S.D.N.Y. 2012)("To invoke the presumption, a party must first produce evidence of mailing.")(citation omitted).  On this question, therefore, the Court finds against Defendants; Citibank is not entitled to a presumption that Plaintiffs received the Client Manual.


### 3. Inquiry Notice and Constructive Receipt

Defendant also argues that Plaintiffs should be charged with constructive receipt of the arbitration agreement because they were given notice that would have led a prudent person to inquire about it.  The Court should attribute to Plaintiffs receipt of the Client Manual, Defendant argues, because they were given notice of its existence at the account opening and at times thereafter. (<u>See</u> Def.'s Br. at 24-25.)  Plaintiffs, on the other hand, argue that "Plaintiffs cannot be charged with knowledge of an agreement that they had no idea existed." (Pls.' Br. at 17.) On this question, the

Court finds for Plaintiffs because it is "not persuaded that a reasonably prudent offeree in these circumstances would have known of the existence of" an arbitration clause. <u>Specht v. Netscape Communs. Corp.</u>, 306 F.3d 17, 31 (2d Cir. 2002).

When the Court considers whether there was mutual assent on a material term of an agreement, "the contract-formation question will often turn on whether a reasonably prudent offeree would be on notice of the term at issue." <u>Schnabel</u>, 697 F.3d at 120.  "[W]here there is no actual notice of the term, an offeree is still bound by the provision if he or she is on inquiry notice of the term and assents to it through the conduct that a reasonable person would understand to constitute assent." <u>Id</u>.  However, the Circuit explained that

> while it is true that a party cannot avoid the terms of a contract on the ground that he or she failed to read it before signing, an exception to this general rule exists when the writing does not appear to be a contract and the terms are not called to the attention of the recipient.  In such a case no contract is formed with respect to the undisclosed term.

<u>Hirsch</u>, 542 Fed. App'x at 37 (citing <u>Specht</u>, 306 F.3d at 30) (alterations omitted).  The Circuit concluded that "the Client Manual on its face does not state that it is an agreement or that it contains terms and conditions governing these accounts." <u>Id.</u>

In the instant case, it is uncontested that Plaintiffs executed the signature cards upon opening their bank accounts. (Hirsch Dep. 52:12-53:13; Romanov Dep. 37:12-38:37; Def.'s Br. at 25, 28; Exs. C, D.)  According to Citibank, it was Plaintiffs who failed to investigate despite being prompted to inquire by the word

37

"agreement" on the signature card and the sentence on the account balance statement, which directs the client to "refer to your Citibank Account Terms and Conditions for details" on monthly fees. (Def.'s Br. at 24-25; Exs. C, D, L.)  Defendant's argument, however, misses the point: even if the Court could find that Plaintiffs were given Client Manuals,[20] the Client Manual does not indicate that it is the agreement that governs the parties' relationship until page 5. (See Def.'s Br. 3 n.2; Ex. F.)[21]  Here, "Plaintiffs were responding to an offer that did not carry an immediately visible notice of the existence of [arbitration or other] terms or require unambiguous manifestation of assent to those terms.  Thus, plaintiffs' 'apparent manifestation of . . . consent' was to terms 'contained in a document whose contractual nature [was] not obvious.'" Specht, 306 F.3d at 31 (citation omitted).

---

[20] See Sections II.B.1-2 supra.

[21] Indeed, Citibank updated its Client Manual after the commencement of this action, and the cover of the revised document now clearly indicates that it is an agreement. (Pls.' Br. at 15; Ex. B)("It is an agreement between you and us.")  Though Defendant argues that this evidence is inadmissible as a subsequent remedial measure, (Jan. Hr'g Tr. 27:18-20, 135:4-7), it has not provided an example of a non-tort action where evidence has been excluded on this basis. See 2-407 Weinstein's Federal Evidence § 407.03 (Fed. R. Evid. 407's "generally accepted ground is the policy of encouraging potential defendants to take safety precautions without fear that this will be used as evidence against them.")(emphasis added).  Even if the exclusionary rule did apply to contract cases, however, "such evidence is admissible to rebut" Defendant's contention that the Client Manual is clearly an agreement. Pitasi v. Stratton Corp., 968 F.2d 1558, 1560-61 (2d Cir. 1992)(citing Kenny v. Southeastern Pennsylvania Transp. Auth., 581 F.2d 351 (3d Cir. 1978)); (See Def.'s Br. at 35)("a review of the Client Manual itself, makes clear that the Client Manual is an agreement").

Nor, contrary to Citibank's argument, did its employees make clear to clients that the Client Manual was a contract, much less that it contained an arbitration clause.  Personal bankers attested to making vague statements like "Here's . . . the disclosure, manual," (Ashley Dep. 45:11-13), in addition to telling clients "this is where they can find information about their account," (Zubair Dep. 21:10-11), and that "everything they need is within there." (Safir Dep. 20:17-18.)  But "that's about it." (Safir Dep. 20:19.)  The employees' testimony makes clear that they never told Plaintiffs that the Client Manual was a "contract," "agreement," or contained the "terms and conditions" of their account and, indeed, employees were not even required to review the Client Manual with new clients. (Lewis Dep. 16:10-16.)  So, while the law is generally unforgiving of a party's failure to read an agreement, <u>Gillman v. Chase Manhattan Bank</u>, 73 N.Y.2d 1, 11 (N.Y. 1988), it is even less forgiving of undisclosed material provisions of a document whose contractual nature is not obvious, for "'clarity and conspicuousness of the term is important.'" <u>Schnabel</u>, 697 F.3d at 120 (citing <u>Specht</u>, 306 F.3d at 30)(alteration omitted).

Defendant's notice argument also fails because Citibank's employees indicated that they provide Client Manuals to clients only <u>after</u> clients sign the signature card. (Ashley Dep. 44:21-45:5; Safir 20:20-21:17, 47:25-48:17.)  When signature cards are presented to clients to sign, furthermore, employees do not explain their significance. (Jan. Hr'g Tr. 51:16-52:3.)  Clients are informed of the signature card's security and tax implications,

according to Mr. Lotto, but he could not say with certainty that personal bankers explain the card's binding nature or the terms of an agreement. (Jan. Hr'g Tr. 56:10–57:23.)

Even "had the [Client Manual] more clearly indicated that it contained an arbitration clause, the fact that it was delivered after enrollment and did not require any affirmative acknowledgment of receipt . . . undermines [Citibank's] assertion that the plaintiffs received sufficient notice to bind them to the additional terms through their inaction." Schnabel, 697 F.3d at 123 n.14 (internal quotation and citation omitted). The record makes clear that Parties did not bargain for the incorporation of an arbitration clause before their apparent assent. "As a general principle, an offeree cannot actually assent to an offer unless the offeree knows of its existence," Schnabel, 697 F.3d at 121 (citing 1 Williston on Contracts § 4:16). Because "[a]n offer -- and all of its terms -- [must] ordinarily precede acceptance," there was no mutual assent on the arbitration provision. Id. Therefore, that term cannot be considered as part of the agreement. See Cory v. Golden State Bank, 95 Cal. App. 3d 360 (Cal. Ct. App. 1979)(Where the "provision in question is effectively hidden from the view of money order purchasers until after the transactions are completed, . . . . purchasers are not chargeable with either actual or constructive notice of the . . . . provision, and therefore cannot

be deemed to have consented to the provision as part of their transaction.").

   Defendant contends that Plaintiffs, possessing superior knowledge, should be held to a higher standard, making Plaintiffs' failure to inquire about the Client Manual unreasonable. (Def.'s Br. at 24-25.)  However, it is Citibank -- not Plaintiffs -- who should rightfully be attributed "superior knowledge" of account opening procedures.  Given the evidence on the record regarding the lax corporate policy and inconspicuousness of contract terms, concluding otherwise would put the onus on the wrong party, and the result would be contrary to sound policy.  So while "plaintiffs may have been aware" that bank accounts are governed by some terms and conditions, Specht, 306 F.3d at 31-32; (see Hirsch Dep. 31:12-20), a reasonable person would be inclined to think about withdrawal and transfer polies, check writing limits, minimum account balances, and fees -- the items disclosed by Citibank during the account opening process. (Ashley Dep. 40:17-41:19, 56:7-24.)  Plaintiffs' general awareness that some terms would govern the accounts "does not mean that they reasonably should have concluded that the [agreement] contained a notice of" an arbitration clause. Specht, 306 F.3d at 32.

   The Court concludes that "there is nothing in the record to suggest that the [Client Manual] appear[ed] to be a contract [or

that] the terms [were] called to the attention of the
[plaintiffs]." <u>Schnabel</u>, 697 F.3d at 127 (citing <u>Specht</u>, 306 F.3d
at 30).   Furthermore, Defendant's policies effectively hid from its
clients important terms of their relationship.   Indeed, "cases
applying the 'duty to read' principle to terms delivered after a
contracting relationship has been initiated do not nullify the
requirement that a consumer be on notice of the existence of a term
before he or she can be legally held to have assented to it."
<u>Schnabel</u>, 697 F.3d 110 at 124.   Plaintiffs, therefore, cannot be
charged with notice of the arbitration clause. <u>See</u> <u>Specht</u>, 306 F.3d
at 30 ("In such a case, no contract is formed with respect to the
undisclosed term.").

C. Incorporation by Reference

"Under California law, parties may validly incorporate by
reference into their contract the terms of another document." <u>Baker
v. Aubry</u>, 216 Cal. App. 3d 1259, 1264 (1st Dist. 1989).  However,
"[t]he reference to the incorporated document must be 'clear and
unequivocal, the reference must be called to the attention of the
other party and he must consent thereto, and the terms of the
incorporated document must be known or easily available to the
contracting parties.'" <u>Id.</u> (citing <u>Chan v. Drexel Burnham Lambert,
Inc.</u>, 178 Cal. App. 3d 632, 641 (2d Dist. 1986))(alterations

omitted).  In New York, similarly, "[t]he doctrine of incorporation by reference requires that the paper to be incorporated into a written instrument by reference must be so referred to and described in the instrument that the paper may be identified beyond all reasonable doubt." <u>Chiacchia v. National Westminster Bank</u>, 124 A.D.2d 626, 628 (N.Y. App. Div. 2d Dep't 1986).  Furthermore, "[a] complete analysis of incorporation by reference considers the materials provided with the agreement." <u>Hirsch</u>, 542 Fed. App'x at 36.

In accordance with the discussion and analysis in the sections above, the Court has no basis to find that Citibank provided Plaintiffs with the Client Manual when they opened their accounts. In addition, Defendant's practice had Plaintiffs execute a document that failed to reference the terms and conditions it attempted to incorporate before the document was supposed to be given to them. In fact, when pressed by the Court on the issue, Citibank's Great Neck branch manager testified that employees would explain the signature card's security and tax function, but he was not certain that customers were told signing the card would bind them to an undisclosed agreement. (Jan. Hr'g Tr. 56:13-57:23.)

Whereas in <u>Samuel L. Hagan II, P.C. v. J.P. Morgan Chase Bank, N.A.</u>, 33 Misc. 3d 1211(A), 1211A (N.Y. Sup. Ct. 2011) "the signature card specifically referenced the Account Agreement, and,

43

thus, there [was] no bona fide issue of fact that its terms were
incorporated into the agreement contained in the signature card,"
here, the "agreement, which was signed by the plaintiff, contained
no direct reference to, or description of its paper entitled" the
Client Manual. Chiacchia, 124 A.D.2d at 628.  "[T]he alleged
agreement [ ] failed to clearly and unequivocally refer to the
incorporated document," because "the reference [neither]
identif[ied a] document or source by title" nor "guide[d] the
reader to the incorporated document." Chan, 178 Cal. App. at 643.
Though Defendant contends that the Client Manual was incorporated
by reference, "[t]here is an insufficient basis from which to draw
such a conclusion here." Chiacchia, 124 A.D.2d at 628.  The Court,
then, finds for the Plaintiffs.


    D. Equitable Estoppel

    The final issue concerns equitable estoppel.  The law in this
Circuit holds "that where a [party] 'knowingly accepted the
benefits' of an agreement with an arbitration clause, even without
signing the agreement, that company may be bound by the arbitration
clause." MAG Portfolio Consult, GmbH v. Merlin Biomed Group, LLC,
268 F.3d 58, 61 (2d Cir. 2001)(citing Deloitte Noraudit A/S v.
Deloitte Haskins & Sells, U.S., 9 F.3d 1060, 1064 (2d Cir. 1993)).
Thus, the Court may enforce an arbitration clause if a party

44

exploited benefits "flowing directly from the agreement." Id.

Prior to remand, Defendant argued that Plaintiffs "obtained benefits under the Client Manual, namely account management services and interest," while Plaintiffs asserted that "they did not receive any benefits stemming from the Client Manual." Hirsch, 542 Fed. App'x at 37.  Despite conceding that "the estoppel issue is not something that's going to be presented," (Dec. Hr'g Tr. 17:2-4), however, Citibank argues in a footnote that it "reserves all of its rights with regard to the estoppel argument, including pursuing this argument at a later date." (Def.'s Br. at 5, n.3.) The Court disagrees, finding that Citibank has waived its right to raise the estoppel argument.

"Courts generally enforce stipulations that narrow the issues in a case." Sinicropi v. Milone, 915 F.2d 66, 68 (2d Cir. 1990). Furthermore, there is no requirement that a stipulation limiting triable issues be in writing. See United States v. Mohel, 604 F.2d 748, 753-54 (2d Cir. 1979)(rejecting the claim "that there must be a written stipulation before [certain matters] can be treated as not in issue").  During the December 20, 2013 discovery conference before Judge Cott, Plaintiffs sought to have the Court compel Citibank to produce a certain set of documents that it claimed "goes to [ ] the estoppel argument." (Dec. Hr'g Tr. 13:5-6.)  After some discussion of the issues on remand, however, Parties

45

stipulated that they would limit discovery if the estoppel issue was not going to be raised.  The Court asked Citibank "[a]re you pressing your equitable estoppel argument at the hearing in January," and explained "[i]f you are, then maybe that changes things." (Dec. Hr'g Tr. 15:23-25.)  Defendant answered in the negative, and explained that "[t]he estoppel argument is a very minor argument," and it was "not even really on the table." (Dec. Hr'g Tr. 16:22-23.)

When a party "bargain[s] for and accept[s] the benefits of the . . . Stipulation and Order, [it] waive[s the] right to contest . . . unless [it] can demonstrate separate grounds for rescission of the stipulation." Keiser v. CDC Inv. Mgmt. Corp., No. 99 Civ. 12101, 2003 U.S. Dist. LEXIS 25383, *12 (S.D.N.Y. Mar. 25, 2003) (citing Dousmanis v. Hornstein, Inc., 581 N.Y.S.2d 327, 327-28 (1st Dep't 1992)).  Establishing that rescission is proper "is a heavy burden, however, as there is a strong judicial policy in favor of enforcing stipulations, and parties 'may stipulate away statutory or even constitutional rights.'" Id. (citing Merwest Realty Corp. v. Prager, 694 N.Y.S.2d 38, 39 (1st Dep't 1999)).  During the conference before Judge Cott, Parties' stipulation, which resolved a discovery dispute, "narrowed the issues before the court." Sinicropi, 915 F.2d at 68.  Just as in Sinicropi, where the "appellant agreed to forego her appeal . . . in exchange for

appellee's agreement to waive their defenses," id., Plaintiffs ended their pursuit of discovery materials related to the estoppel issue in exchange for Citibank dropping the estoppel argument. (See Dec. Hr'g Tr. 17:24-18:1)("But now you have on the record a representation from counsel that estoppel is going to be out of your hearing . . . .") Plaintiffs "relied upon the Stipulation to [their] detriment," and this Court finds no reason to undermine that agreement. Sinicropi, 915 F.2d at 68. Citibank may not now raise the estoppel argument that it waived because both sides "surrendered significant rights in order to secure relief that each party determined to be in its best interest." Keiser, 2003 U.S. Dist. LEXIS 25383, at *11.


III. CONCLUSION

For the foregoing reasons, Defendant's Motion to Compel Arbitration and Request to Stay the Action is DENIED. All discovery, including expert discovery, shall be completed by October 31, 2014. A conference in this matter will be held on November 20, 2014 at 11:00 a.m.

SO ORDERED.

Dated: June 10, 2014
        New York, New York

_Deborah A. Batts_
Deborah A. Batts
United States District Judge